### STATE v. IRWIN A. GARDNER.[1]

December 19, 1902.

Nos. 12,280—(19).

### Affidavit of Prejudice.

Laws 1895, c. 306, construed, and *held*, that the right of a defendant in a criminal case to incapacitate, by an affidavit of prejudice, a judge to try his case, is limited to the judge against whom the affidavit is first filed; that is, he is entitled, as a matter of strict legal right, to but one change of judges.

### Witness before Grand Jury.

If the defendant in a criminal case is compelled to be a witness against himself before the grand jury, it is a violation of the guaranty of the constitution that no person in a criminal case shall be compelled to be a witness against himself, and it is the imperative duty of the court in such a case to quash the indictment found against him, although his name is not indorsed thereon as a witness.

### Immunity of Accused.

The constitutional guaranty not only protects a person from being compelled to give direct evidence tending to establish his guilt, but also from giving any circumstance or link in the chain of evidence which may tend to convict him of a crime.

### Motion to Quash Indictment.

The affidavit upon which the defendant herein based a motion to quash the indictment for the reason that he was compelled to be a witness against himself before the grand jury considered, and *held* to be suffi-

[1] Reported in 92 N. W. 529.

cient to require the state to traverse it, and the court to determine the motion on the merits.

## Acceptance of Bribe.

The defendant was indicted for accepting a bribe upon the agreement or understanding that he would not, as a police officer, arrest or prosecute the confidence men from whom he received the bribe, but would permit them, without arrest or prosecution, to ply their swindling games in the city of Minneapolis, and that he would influence the police force of the city to permit them so to do. *Held*, that the indictment properly alleges that the defendant was an executive officer; that the subject of the corrupt agreement was a matter which might be brought before him in his official capacity; that it was not necessary to allege that he intended to keep his promise, or that he knew that the men from whom the bribe was received had or intended to commit any crime; and that the indictment charges a public offense.

## Evidence.

It was not error for the court to receive evidence tending to show that the defendant carried into effect the agreement on his part. His acts and declarations in the premises, and those of the persons from whom the bribe was received, of which he had knowledge, were admissible in evidence against him; but it was error to receive evidence of the acts and declarations of such persons and of members of the police force with which it was not shown that the defendant was connected.

Appeal by defendant from an order of the district court for Hennepin county, Harrison, J., denying a motion for a new trial, after a trial and conviction of the crime of accepting a bribe. Reversed and remanded, with directions.

*Erwin & Mead*, for appellant.

*W. B. Douglas*, Attorney General, *Al. J. Smith* and *F. H. Boardman*, County Attorney, for the State.

START, C. J.

The defendant was indicted and convicted in the district court of the county of Hennepin of the crime of accepting a bribe of $500 on November 17, 1901, upon the agreement that, as a police officer of the city of Minneapolis, he would not arrest or prosecute Lincoln G. Crossman and William Edwards, from whom the bribe was received, but would permit them, without arrest or prosecution, to ply within the city their confidence games of three-card

monte and other tricks and devices for swindling the unwary, and that he would also influence the police of the city to permit them so to do. He was sentenced, upon a verdict of guilty, to serve a term of six years in the state prison, and he appealed from an order denying his motion for a new trial.

One hundred and thirteen errors are assigned, but we find it necessary to consider only those which raise these questions:

(a) Did the trial court err in its ruling as to the defendant's affidavit of prejudice on the part of the trial judge?

(b) Was it error to deny the defendant's motion to quash the indictment on the ground that he was compelled to give testimony before the grand jury touching the charge alleged in the indictment?

(c) Does the indictment charge a public offense?

(d) Did the court err in its rulings on the admission of certain evidence offered by the state?

1. The indictment was dated May 15, 1902, and returned into court the next day, but on what day the charge against the defendant was investigated by the grand jury does not appear by the record. The defendant was arraigned and given until May 22 to plead. On May 20 he presented to the presiding judge in charge of the criminal calendar for the term an affidavit to the effect that on account of prejudice or bias of four of the six judges of the district court, naming each of them, including the presiding judge, he had good reason to believe, and did believe, that he could not have a fair trial. Thereupon the presiding judge made an order assigning the case to another judge of the district, who was one of the judges so named in the affidavit. The defendant then presented a separate affidavit of prejudice on the part of the judge to whom the case was so assigned. This affidavit was ignored by such presiding judge; that is, he in legal effect ruled that the making of the affidavit did not incapacitate him to try the case. The defendant claims that this was error, for the reason that the making of the affidavit ipso facto disqualified the judge against whom it was made.

The state, on the other hand, claims that the defendant, having made and presented to the presiding judge in charge of the crim-

inal calendar an affidavit of prejudice against him, and thereby secured the transfer of the case to another judge, exhausted his right under the statute, and could not so incapacitate one after another of all of the judges secured to try the case until he found a judge satisfactory to him, or the list of the district judges of the state was exhausted.

The solution of the question depends upon the construction to be given to Laws 1895, c. 306, entitled "An act to enable parties to actions in the district court in this state to secure an impartial judge to hear and preside at the trial of said actions." The act provides that in any civil action in the district court of this state, if any party thereto, not less than six days before the first day of the term at which the action is noticed for trial, shall make and file with the presiding judge, and serve it on the opposite party or his attorney, an affidavit that on account of prejudice or bias on the part of the presiding judge he has good reason to believe and does believe that he cannot have a fair trial of the action, another judge of the same or another district shall be secured to try the action.

"On making and filing with the presiding judge such an affidavit by the defendant in a criminal action not less than two days before the expiration of the time allowed to him by law to prepare for trial, some other judge shall likewise be secured to preside at the trial of said action and said presiding judge shall in either of such cases be incapacitated to try said action: provided, if the judge against whom said affidavit is filed in a criminal action shall so order, the place of trial of said action may be changed to another county or judicial district so as to secure a speedy trial before another judge. Provided, that in districts having more than one judge the affidavit above provided for may be filed within one day after it is ascertained which judge is to preside at the trial. Provided, that this act shall not apply to any judicial district in this state having less than three district judges."

This statute is in some respects crudely drawn, and its meaning is not quite clear as to the question here under consideration. It gives a right not before possessed by parties to actions in the district court, and it must be interpreted with reference to the existing law at the time of its passage. The only statute then in

existence as to the disqualification of a judge to hear a cause was G. S. 1894, § 4838, which provided that:

"No judge of any of the courts of record of this state shall sit in any cause in which he is interested either directly or indirectly, or in which he would be excluded from sitting as a juror."

The interest which disqualifies a judge under this statute is a pecuniary interest in the event of the action, and not an interest of feeling, or sympathy, or bias that would disqualify a juror; otherwise a judge who had tried a case would be disqualified to hear a motion for a new trial, or to again try the cause in case a new trial was ordered by him or by this court, for necessarily a judge who has once tried a cause has some feeling, opinion, or belief as to its merits. Sjoberg v. Nordin, 26 Minn. 501, 5 N. W. 677. The result of this interpretation of the statute was that a party to an action who honestly believed that the judge who was to try his cause was so prejudiced that a fair trial could not be had before him had no practical remedy, and Laws 1895, c. 306, was enacted to afford him such a remedy.

In determining whether it was the legislative purpose by this remedial law to place in the hands of a defendant in a criminal case the power to prevent any trial of his case by disqualifying by an affidavit of prejudice every judge in the state who might be secured to try his case, it is proper to take into consideration G. S. 1894, § 7313, which provides for one change of venue of a criminal case, and no more, where it is made to appear that a fair trial cannot be had in the county where the offense was committed. If it is the legislative policy that there shall be but one change of venue in a criminal case, for the reason that, without such limitation, the right might be abused, and the administration of justice greatly embarrassed thereby, why should not the same limitation be applied to a change of judges? Is it reasonable to suppose that the legislature, in remedying a defect in an existing law, intended to give to a person charged with a crime the power, if he is willing to make affidavits to order, to disqualify to try his case one after another all the district judges of the state? If the law so provides in terms so clear as to admit of no

other reasonable construction, it must be given effect accordingly; otherwise not. · Now, if the statute in question be read in the light of these suggestions, it is reasonably clear that the statute was not intended to permit a party to disqualify more than one judge in the same action by an affidavit of prejudice, and that, in analogy to a change of venue in a criminal case, the defendant's right to have his case transferred to another judge for trial is limited to one transfer. Any other conclusion would, in cases where there was no integrity in the conduct of the trial, lead to gross abuses, and a miscarriage of justice; for, if it be once conceded that the party has the right to disqualify more than one judge, there is no limit to the right. Nor can the court control the matter, for the making and presenting of the affidavit disqualifies the judge without any other act.

It is further urged on behalf of·the defendant that the fact that the statute provides that the judge against whom the affidavit of prejudice is made may change the place of trial to another county or district so as to secure a speedy trial before another judge, when taken in connection with the further fact that the last proviso of the statute limits its operation to judicial districts having at least three judges necessarily implies that the defendant may disqualify all of the judges of a district by an affidavit of prejudice. And, further, if the right to disqualify a judge is limited, as claimed, there would have been no necessity for providing for a change of the place of trial to another district, so as to secure a speedy trial before another judge; for when the presiding judge was disqualified there would remain in the district at least two qualified judges either of whom could try the case.

These suggestions, which seemed to us to be worthy of consideration, and the peculiar structure of the statute, lead to an examination of the journals of the senate and house for the year 1895, and we find that the original bill as it passed the senate did not contain the proviso here in question, but that the bill was amended in the house by adding the proviso. It is clear from the history of the statute that it provides for the necessary machinery to enable the defendant in a criminal action pending in any judicial district of the state to avail himself of its benefits, and that

the provision for a change of the place of trial to another judicial district was a practical necessity if the statute was to be given full effect in districts having only one judge. It might well happen in such districts that the judge could not secure another judge to come into his district and try the case; hence the provision for a change of the place of trial to another district. For these reasons controlling weight cannot be given to the proviso in construing the statute, and we hold that the right of the defendant in a criminal case to incapacitate a judge to try his case by an affidavit of prejudice is limited to the presiding judge against whom the affidavit is first filed; that is, he is entitled, as a matter of strict right, to but one change of judges.

2. The defendant duly made a motion to quash the indictment against him for the reason that he was compelled by the process of the court to go before the grand jury and to testify touching the charge alleged in the indictment against him. In support of his motion he made and filed his affidavit with the court, which set forth, with other matters, substantially the following alleged facts: On May 6, 1902, the foreman of the grand jury, in a conversation with the defendant, asked him if he had a family, and, upon being answered in the affirmative, said that it was bad enough for a single man to get into trouble, but worse for a married one, and expressed sympathy for him on account of his youth and family. He then told the defendant that the only way to save himself from severe punishment was to tell all he knew about the mayor of the city, his administration, and the receipt of "hush money" by the police force; that his only opportunity was to tell the grand jury all he knew about the matter; that he would be brought before the grand jury, and the only way to clear himself was to make a clean breast of everything. Two days afterwards an officer drove to the defendant's home, and took him in a hack to the grand-jury rooms, where he was served with a subpoena (a copy of which was annexed to the affidavit) to appear before such jury. Before going before the jury, the defendant was told by the assistant county attorney that there was evidence to send him over the road, and that the only safe course for him to pursue was to testify before the jury to all that he knew about the matter.

What took place before the grand jury is stated in the affidavit substantially as follows:

"I was called before the grand jury, and duly sworn. I was then examined by the foreman of the grand jury in regard to many things. I was also examined by the assistant county attorney before the grand jury. During my examination * * * I was asked whether I had ever received money from any person (meaning hush money, or money received for concealing or compounding offenses), and I testified fully and completely in relation to the question asked me, giving to the grand jury all my knowledge which I had in relation to the receipt or disposition of any such money. * * * During the same examination I was asked whether I had not handed to Mr. Norbeck (a policeman) $50, to which question I answered and testified to all that I knew in relation to the receipt and transfer of $50. I was also, during that examination, asked what I knew in relation to anybody's receiving money—meaning money received for improper purposes as hush money, or as 'graft,' or to conceal or compound offenses, or as a bribe—to which question I testified fully and completely as to all my knowledge in regard to hush money or 'graft' money received as a bribe or given as a bribe, or money to conceal or compound offenses, giving to the jury all that I then knew in relation to such transactions and in answer to their question. I was also asked during that examination the following questions: 'Do you not know of "graft" being made by some one?' 'Do you not know of money being paid?' 'Do you not know of money being offered?' To which questions I testified fully and completely as to all my knowledge in relation to the subject-matter of such questions. During this examination I was also asked if I was not a police officer, and also asked whether I wore a star, to which questions I answered fully and completely, giving them all my knowledge in reference to such questions, and in reference to my status toward the police force and towards the city. During my examination the assistant county attorney brought in a law book, and offered to show me where I could read in such book that I would be protected if I gave evidence before the grand jury, and about the close of testimony [he] asked me, 'Will you not know more about this by to-morrow morning at 11 o'clock, if we will give you until that time?' to which I answered, 'No, sir; I can give right now all that I know.' I was then discharged."

The defendant's name was not indorsed on the indictment as a witness. The only names thereon were those of William Edwards and Lincoln G. Crossman. The defendant also, in connection with his motion, moved the court to direct the production of the

minutes of the grand jury. There was no traverse by the state of the affidavit upon which the motion was based. The trial court refused to direct the production of the minutes, and denied the motion. The ground for the decision of the court does not appear from the record except by inference. It is certain from the record that the motion was not denied, because the alleged facts therein stated were untrue, for they were not denied by the state, and the court could not have assumed that the affidavit was false, for the defendant then stood fair before the court, presumed to be innocent of the charge made against him in the indictment. The only conclusion that can be drawn from the record is that the motion was denied because the facts alleged in the affidavit were, as a matter of law, insufficient to call upon the court to enter upon an investigation of the merits of the charge that the defendant was subpœnaed before the grand jury, and required to give evidence against himself. This is the only ground upon which it is possible to sustain the order of the court denying the motion to quash.

Whether the affidavit was sufficient or not was a question of law. If it was, the motion should have been granted, the state having declined to traverse it; but, if it was not, the court had no discretion in the premises, as counsel for the state seems to claim. If in fact the defendant was compelled to be a witness against himself before the grand jury, it was a violation of his personal right guarantied to him by the constitution of the state, which provides that no person in a criminal case shall be compelled to be a witness against himself. If such were the case, it was the imperative duty of the court to grant his motion to quash the indictment, for courts have no discretion in the matter of giving effect to constitutional guaranties. State v. Froiseth, 16 Minn. 260 (296); Boyd v. U. S., 116 U. S. 616, 6 Sup. Ct. 524; Councilman v. Hitchcock, 142 U. S. 547, 12 Sup. Ct. 195; U. S. v. Edgerton (D. C.) 80 Fed. 374.

The fact that the defendant's name was not indorsed on the indictment as a witness does not impair his right to have the indictment quashed if in fact he was compelled to be a witness against himself, for his right in this particular could not be

evaded by the easy subterfuge of omitting his name as a witness from the indictment. The case of State v. Hawks, 56 Minn. 129, 57 N. W. 455, does not hold to the contrary. Counsel for the state, in their brief, urge that "a perusal of the testimony of the defendant given on the trial will show that no person could have been indicted upon it." This is not significant, for it cannot be possible that a person may be compelled to be a witness against himself before the grand jury, and that his motion to quash the indictment for that reason may be denied, with no means of redressing the error unless on his trial he voluntarily gives evidence which justifies the indictment against him.

It is further claimed by them that the indictment was found upon the testimony of Edwards and Crossman. This, however, if true, affords no good reason why the defendant's motion was not heard on the merits. The constitutional guaranty is, not that no person shall be compelled to give evidence against himself which is made the basis of an indictment against him, but it is that he shall not be compelled to be a witness against himself. This constitutional guaranty must receive a liberal construction, to the end that personal rights may be protected. It was not necessary for the defendant to show that he had been in fact injured, for, as was well said by the court in the case of U. S. v. Edgerton, supra: "Where a witness is compelled to testify against himself, the injury inheres in the violence done to his rights. It is not susceptible of proof, nor the policy of the law to require it; and the injury done to the public in such case outweighs that suffered by the defendant. It is a matter of the highest public policy that crime shall be punished by legal methods." Better an occasional miscarriage of justice than that the constitutional rights of the meanest man should be disregarded.

The constitutional guaranty not only protects a person from being compelled to give direct evidence tending to establish his guilt, but also from giving any circumstance or link in the chain of evidence which may tend to convict him of a crime. It is a reasonable construction to hold that it protects a person from being compelled to disclose the circumstances of his offense, the

sources from which or the means by which evidence of its commission or of his connection with it may be obtained, or made effectual for his conviction, without using his answers as direct admissions against him. For all practical purposes, such disclosures would have the effect to furnish evidence against the party making them. They might furnish the only means of discovering the names of those who could give evidence concerning the transaction, an instrument by which a crime was perpetrated, or even the corpus delicti itself. Both the reason upon which the rule' is founded and the terms in which it is expressed forbid that it should be limited to confessions of guilt, or statements which may be proved in subsequent prosecutions as admissions of facts sought to be established therein. Emery's Case, 107 Mass. 172, 182.

Counsel for the state also urge that the ruling of the trial court in denying the defendant's motion was correct, because "the defendant never did give any testimony incriminating himself or any other person, and was never asked to do so." This may be so. We know not. But, if so, the proper time to have asserted the fact was by a traverse of the defendant's affidavit, and not for the first time in their brief.

The last claim urged by counsel for the state in this connection is that the defendant's affidavit was insufficient to put the court upon inquiry as to the alleged violation of the defendant's constitutional rights. This, as already suggested, is the only serious question as to the denial of the defendant's motion. It is objected that the affidavit does not set forth the evidence given by the defendant before the grand jury in detail. This was not necessary, for the affidavit is sufficient if it fairly alleges that the defendant was compelled to be a witness against himself. It would place the defendant in a serious position in case of a denial of his motion on the merits, if, in order to have it so heard, he was bound to set out in detail his incriminating testimony before the grand jury. It is not necessary to repeat the allegations of the affidavit. They fairly show that the defendant's guilt was assumed by the foreman of the grand jury and the assistant county attorney; that an attempt was made by them to induce

him to turn state's evidence by urging the consequences to himself and his family if he refused so to do; that he was taken by an officer to the courthouse, where a subpœna was served upon him to appear before the grand jury; that he appeared in response thereto; and that he was examined touching the alleged official corruption of the police force and other officials of the city, and as to whether he himself was not a public officer, and had not received hush money. This, within the rules we have stated, was sufficient to call upon the court to investigate the charge upon the merits, and we hold that it was error for the court to deny the defendant's motion without doing so.

With reference to the defendant's motion for an order of the court requiring the production of the minutes of the grand jury, it is only necessary to say that he was not entitled to the minutes as a whole, but, if the motion to quash had been heard on the merits, he would have been entitled to have produced and to offer in evidence that part of the minutes which would show what case or subject, if any, was under consideration by the grand jury when he was called as a witness. The state would have had the same right.

3. The defendant, by a demurrer, and by objections to the admission of any evidence, raised the question of the sufficiency of the indictment, and he here urges that it does not allege facts constituting a public offense, for the reason it does not allege that the defendant was an executive or administrative officer, or that he was elected or appointed to such an office, nor that the subject of the corrupt agreement was a matter which might be brought before him in his official capacity, nor that he intended to perform the agreement set forth in the indictment, nor that he knew that the men with whom he had the alleged agreement had or intended to commit any crime.

The indictment is based upon G. S. 1894, § 6327, which provides that:

"An executive or administrative officer, or person elected or appointed to an executive or administrative office, who asks, receives, or agrees to receive any bribe, upon an agreement or understanding that his vote, opinion, or action upon any matter

then pending, or which may by law be brought before him in his official capacity, shall be. influenced thereby, is punishable by imprisonment in a [the] state prison not exceeding ten years, or by a fine not exceeding five thousand dollars, or by both; and in addition thereto forfeits his office, and is forever disqualified from holding any public office under this state."

A police officer of a municipality of this state is an executive officer within the meaning of this section. People v. Jaehne, 103 N. Y. 182, 188, 8 N. E. 374.

The indictment alleges that the defendant was a police officer of the city of Minneapolis, duly appointed and acting as such. This allegation of ultimate facts is a·sufficient allegation that the defendant was an executive officer, and of his appointment as such. The indictment alleges that it was the duty of the defendant, as such police officer, and that he had the authority so to do, to arrest and prosecute persons committing the crime of swindling, and to prevent and detect offenses against the laws of the state and city; hence it appears from the allegations of the indictment that the defendant received a bribe in a matter which might come before him in his official capacity.

It was not necessary to allege in the indictment that the defendant intended to or had performed his agreement, or that he knew that the parties from whom he received the bribe had or intended to commit any crime. If he received money in consideration of his promise that he would not arrest the persons from whom he received the money for operating swindling games, his crime was complete. People v. Markham, 64 Cal. 157, 30 Pac. 620. The indictment charges the defendant with a public offense. There was no fatal variance between the indictment and proof, as claimed by the defendant, and the question of the official character of the defendant at the time the alleged offense was committed was a question, under the evidence, for the jury.

4. The defendant assigns some seventy errors to the rulings of the trial court as to the admission of evidence. It is impracticable to state, discuss, and decide them in detail. Nor is it necessary to do so, for there must be, in any event, a reversal of the order appealed from, for error in reference to the defendant's

motion to quash the indictment; but with reference to another trial we deem it advisable to state our conclusions as to such rulings. The alleged errors as to the admission of evidence which merit consideration logically fall into one or the other of two classes:

First. Those that relate to evidence given by the state on the trial tending to show that the alleged corrupt agreement was made; that thereafter Edwards and Crossman opened, with the knowledge of the defendant, a room where they engaged in the business of swindling people by three-card monte and other tricks and devices; that the defendant visited the room, knew what was going on, did not arrest them, but protected them; that he received a list of their confederates and steerers, so that they also might be protected from arrest; that he advised them when to suspend business, and when to change their place of business to avoid trouble; and that the details of several cases of swindling were communicated to him, and he advised with the offenders with reference thereto.

Second. Those that relate to evidence tending to show the details of other swindles committed by Edwards and Crossman and their confederates, of which there is no evidence tending to show that the defendant had knowledge; and those that relate to evidence tending to show admissions of other members of the police force, the chief of police, and the mayor, and their conversations with Edwards and Crossman touching the business of the latter, particularly the alleged admissions and statements of Detective Norbeck, of the police force, with which the defendant was not shown to have been connected, or to have had knowledge thereof.

Evidence falling within the first class was relevant, and properly received, for it tended to show just the state of facts which would naturally be expected to follow if the alleged corrupt agreement had been made. It tended to show the execution of the agreement on the part of the defendant, and to corroborate the testimony of Edwards and Crossman that the corrupt agreement was made as alleged. To render such evidence competent, it was not necessary to connect the defendant with the acts of Edwards

.and Crossman, or to show that he had knowledge of them, by direct evidence, for any facts which would reasonably justify the inference that he must have known of them, and that Edwards and Crossman were doing just what he had agreed they might do, would be competent.

But the evidence falling within the second class was not relevant, and it was reversible error to receive it. It is an elementary rule that on the trial of a party for a crime evidence that he or others committed another unrelated crime is not relevant. There are several exceptions to the rule. The rule and its exceptions are fully considered in the opinion in the case of State v. Fitchette infra, page 145. The evidence here in question does not fall within any of the exceptions. It is true that, after evidence has been given sufficient prima facie to justify a finding by the jury of a conspiracy to commit the crime for which a defendant is on trial, the acts and declarations of each conspirator are admissible in evidence against the defendant, if they were in furtherance of the common purpose to commit such crime. State v. Palmer, 79 Minn. 428, 82 N. W. 685. The state invokes this rule in support of the claim that the acts and declarations of Edwards and members of the police force with which the defendant was not shown to have been connected were admissible in evidence against him.

It is urged in this connection that, the state having established by evidence that a confederacy existed between the defendant Norbeck, the chief of police, and the mayor, all acting with a common purpose, it was then proper to show the declarations and conduct of each, and the parts severally performed by them in the commission of the crime. What crime? Clearly, not the crime for which the defendant was on trial, for he was charged with the crime of receiving a bribe upon an agreement or understanding that his official action as to the arrest and prosecution of the persons paying the bribe for swindling should be influenced thereby; a crime that was fully executed when the promise was made and the bribe accepted. It necessarily follows that the subsequent acts and declarations of the parties who are alleged to have conspired with and aided the defendant in giving police protection to the parties who were plying their occupation of swindling

could not have been done or said in furtherance of any common purpose to commit the particular crime for which the defendant was on trial. If he had been on trial for the crime of aiding and abetting criminals, we should have a different question to consider. If the precise crime charged against the defendant is kept in mind, it is manifest that the admission of the evidence cannot be sustained on the ground that the acts and declarations in question were done and said by his co-conspirators.

It follows that, for the errors we have pointed out, the order appealed from must be reversed, and the cause remanded, with direction that, if the state shall ask and be permitted to traverse the defendant's affidavit upon which he based his motion to quash the indictment, the district court hear the motion on the merits, and, if it is denied, such further action be had in the case as the court deems proper; otherwise that the indictment be quashed. It is so ordered.