## STATE v. FRED EIDSVOLD.[1]

November 25, 1927.

No. 26,301.

**Evidence insufficient to convict defendant of participating in making false statement to obtain credit.**

[1]   A false statement in writing was presented to a bank for the purpose of obtaining loans, credits and extension of credits for a corporation.  The evidence examined and *held* insufficient to show that defendant, one of the three officers indicted for the offense, knowingly participated in making or presenting the statement.

**Exclusion of testimony of defendant's physician error.**

[2]   It was error to exclude evidence that on the advice of his doctor defendant abstained from taking part in the affairs of the corporation.

**Admission of bankruptcy schedules for purpose of impeaching witness.**

[3]   The admission of the bankruptcy schedules of the corporation as impeaching the testimony of the one who made oath thereto and who testified in behalf of defendant was technically correct, had there been anything of substance in his direct examination to impeach, but we fail to find matters of that sort.

[1]Reported in 216 N. W. 316.

Criminal Law, 17 C. J. p. 319 n. 22.
False Pretenses, 25 C. J. p. 648 n. 28; p. 650 n. 42.
Witnesses, 40 Cyc. p. 2719 n. 18.

Defendant appealed from an order of the district court for Brown county, Olsen, J. denying his motion for a new trial. Reversed.

*Smith & Callahan, R. P. Jacobson, William J. Hughes, Jr. William B. Movery,* and *James H. Carroll,* for appellant.

*Clifford L. Hilton,* Attorney General, *James E. Markham,* Deputy Attorney General, and *T. O. Streissguth,* County Attorney, for the state.

Holt, J.

Defendant was jointly indicted with his brothers Robert and Henry for, individually and as an officer of the Minnesota Central Creameries, Inc. having knowingly and wilfully presented a false statement in writing to the Brown County Bank for the fraudulent purpose of procuring loans, credits and extension of credits from the bank for the use of the creameries corporation. On a separate trial he was convicted and appeals from the order denying a new trial.

Robert Eidsvold was tried and convicted some time prior to the trial of this defendant. That conviction was sustained. The case is reported in 172 Minn. 208, 215 N. W. 206, and reference to that opinion is made for the main facts in this case.

[1] The false statement in writing upon which the indictment is based was the one for the month of July, 1925, and is herein referred to as exhibit 7. That this statement could be found to have been false by the jury is not controverted by defendant's attorneys upon this appeal. They accept the opinion of this court in the appeal of Robert Eidsvold as final, conceding the evidence in the two cases upon that issue to be practically the same. But it is vigorously contended that there is not sufficient evidence to permit the jury to find that Fred, this defendant, took any part in the making or presentation of exhibit 7 to the bank or had knowledge of its contents. In the trial of Robert, Robert frankly admitted

responsibility for the presentation of that exhibit, and he did so in the trial of this defendant.

The indictment is drawn so as to charge an offense under G. S. 1923, § 10388(1), namely, of wilfully and knowingly presenting to the bank the false statement, exhibit 7, with the fraudulent intent of procuring loans, credits and extension of credits. Of these facts there is no dispute:

In the fall of 1924, defendant, who was president and active manager of the New Ulm company, became afflicted with diabetes. Robert had been the manager of a creamery company in Minneapolis. The father and the indicted sons held practically all the stock in the two corporations, one-fourth each. Defendant's sickness was such that at times he was confined to his home or laid up in a hospital. However, he was able to be about most of the time during the summer months of 1925, and the jury could find that he was frequently, and almost daily, at the office of the company for a few minutes. When Fred took sick and sometime in the latter part of 1924, Robert moved to New Ulm and from then on took active management of the New Ulm company, and continued in that capacity until in October following, when the company was forced into involuntary bankruptcy. The inference is that simultaneously the Minneapolis company came to the same end. In June and July, 1925, the stockholders and board of directors of the two creamery corporations had separate meetings at which resolutions were duly passed by which the New Ulm company took over the assets and assumed the liabilities of the Minneapolis company, and that transaction was reflected in exhibit 7.

The principal testimony by which the state sought to connect Fred with exhibit 7 came from the bank's cashier and the bookkeeper of the New Ulm company. The latter's testimony negatives Fred's participation in or knowledge of exhibit 7. The cashier's testimony when tested on cross-examination was very uncertain and indefinite as to the part Fred had in any conversation with reference to reports during 1925. And he did not undertake to say that Fred presented exhibit 7, or that he had had any talk with him about it.

The only other item of evidence was furnished by one Penkert, who had charge of a department of the business of the New Ulm company, saying that he saw a copy of exhibit 7 in Fred's hands when there was some discussion of some figures relating to Penkert's department. Fred admits he was called to the office touching some matter in that department and was then shown a copy of exhibit 7; that he requested the bookkeeper to make a copy for him; that he never got it; and the bookkeeper corroborates him in that, saying he was too busy to make it. There is nothing to fix the time when Fred had this cursory knowledge of the existence of this copy. For aught that appears it might have been after the presentation of the original to the bank.

The statute seems to call for proof that the accused knowingly made and presented a false statement to the bank. And it would seem to follow that, in the absence of evidence that Fred had anything to do with the preparation of the statement or that he had ever seen it before it was sent to the bank, he cannot be charged with knowledge of its falsity.

[2] Since the state may deem another trial advisable, we refrain from further comment on the testimony presented by either the state or defendant, except as incidentally necessary to pass on rulings on the admission of evidence upon which errors are assigned and which evidence is likely to be offered if another trial is had. Reference has been made to Fred's state of health. He was not permitted to testify that upon the advice of his doctor and as a part of the cure for his illness he avoided participation in the business after Robert took charge in the fall of 1924, nor was the doctor allowed to testify that he did so advise, although on his cross-examination the state had elicited that Fred was capable of doing business. We think the ruling was erroneous. True, the issue before the jury was not what Fred was able to do or know, but what he actually did or ascertained relative to exhibit 7 before its presentation to the bank. However it can be readily seen that one afflicted as he was, in a desire to be healed, would follow a doctor's advice and consequently avoid seeking information in respect to the

business of the company or taking any part therein, even though he frequently visited there. Had the excluded testimony been received the jury could well have concluded that the short and frequent visits of Fred in the office of the company were not to gain knowledge of what was done but more as a diversion or pastime of a convalescent, and that from such visits no inference could be drawn of any connection with or knowledge of the contents of exhibit 7.

[3] The other ruling was the reception over defendant's objection of the bankruptcy schedules of the New Ulm company filed and sworn to by Robert. These were received as impeaching the testimony of Robert who testified in behalf of Fred, and the learned trial court so limited their effect both when received and very clearly and carefully in the charge. Technically there was no error here, if in fact the schedules impeached or contradicted Robert's testimony given on his direct examination. We think there was nothing of substance to impeach. It was clearly shown, and not disputed, that in June and July, 1925, there was a bona fide attempt to transfer the property of the Minneapolis company to the New Ulm company. Meetings of the shareholders and directors of both corporations were duly held and resolutions of transfer adopted. A competent attorney was employed to see that there was a compliance with law. The personal property of the Minneapolis company was moved to the New Ulm plant, and thenceforth the rent from the real estate of the former was collected by the latter. Robert admitted that no deeds to the real estate had been executed. The fact that the bankruptcy schedules, prepared long after exhibit 7 and under direction of an attorney, omitted the Minneapolis realty does not touch Robert's credibility with reference to the transactions between the two corporations. As a layman he had frankly stated what took place. The schedules were not evidence against Fred and, no matter how carefully the court might limit their effect, the danger of prejudice to him was so great that they should not have been received unless clearly impeaching Robert upon some material point of his direct testimony. We do not think there was anything of that sort in this record.

We need not consider the assignment of error for misconduct of the prosecuting attorney. The hope is that if there be a new trial intemperate or vituperative language will not be used. The state should not rely on such means for conviction.

Order reversed.

WILSON, C. J. (dissenting in part).

I concur in the foregoing opinion except as to the last subdivision thereof. I dissent to the holding that the reception in evidence of the schedules in bankruptcy was technically correct.

In my judgment this violates the constitutional guaranty, state and national, that no person shall be compelled in any criminal case to be a witness against himself. State v. Drew, 110 Minn. 247, 124 N. W. 1091, 136 A. S. R. 491, and other cases cited in appellant's brief.

Defendant as an officer of the corporation was charged with the compulsory duty to disclose the information contained in the schedules. The mere fact that the schedules were verified only by another officer of the corporation does not destroy the fact that the result was in compliance with the duty imposed by law upon the defendant. He was the president. He was on trial for an official act. The information came in response to a demand of the law upon him as such official. The schedules had the same status as if they had been his own individual schedules.

It seems unreasonable to say that the instrument inadmissible under State v. Drew, 110 Minn. 247, 124 N. W. 1091, 136 A. S. R. 491, to prove a criminal accusation may be used in this indirect manner. The learned trial court recognized the constitutional restriction by telling the jury "the schedules are not to be considered by you as any evidence against Fred Eidsvold." The attempt was made to restrict its use in evidence to impeach the witness Robert Eidsvold. Its purpose was to destroy the testimony of defendant's witness. I think that is "evidence against" the defendant. If not, it logically follows that the state could call the defendant himself to the stand and make him testify to things within his knowledge for the sole purpose of impeaching one of his witnesses. To my

mind the constitutional provisions forbid the use in evidence of that information, which the law compels him to disclose, in an effort to convict him of crime. The law cannot be evaded by what in substance is a subterfuge, though I do not suggest that it was so intended. The policy of the law is that the constitutional guaranty must have a liberal construction to the end that personal rights may be protected. State v. Gardner, 88 Minn. 130, 92 N. W. 529. The limitation upon the use of such evidence is unrestricted.

QUINN, J.
I concur with the Chief Justice.