**STATE of Minnesota, Respondent,**

**v.**

**Paul PENKATY, Sr., Appellant.**

No. A04–1315.

Supreme Court of Minnesota.

Jan. 10, 2006.

John M. Stuart, Office of the State Public Defender, Sara L. Martin, Assistant State Public Defender, Minneapolis, for appellant.

Mike Hatch, Minnesota State Attorney General, John B. Galus, Assistant Attorney General, St. Paul, LaMar Piper, Watonwan County Attorney, St. James, for respondent.

## OPINION

ANDERSON, PAUL H., Justice.

A Watonwan County jury found appellant Paul Penkaty, Sr. guilty of first-degree premeditated murder for the March 8, 2003 death of Christopher Knight. The district court convicted Penkaty of first-degree murder and sentenced him to life in

prison. Penkaty appeals his conviction, arguing that (1) the court erred when it denied his motion to dismiss the grand jury indictment based on alleged prosecutorial misconduct; (2) the court erred when it prohibited him from calling witnesses to corroborate his testimony regarding prior acts of violence by Knight; (3) the court erred when it allowed Penkaty's wife to testify at trial without his consent; (4) the court erred when it denied Penkaty's requested instruction on second-degree manslaughter; (5) the court erred in the manner in which it instructed the jury on self-defense, defense of others, and defense of dwelling; (6) the court erred when it failed to sua sponte give an instruction on first-degree manslaughter; (7) the court erred when it reserved its ruling on his motion for judgment of acquittal until the end of the presentation of Penkaty's case; and (8) the evidence of premeditation was insufficient to support a conviction for first-degree premeditated murder. We reverse.

At the time of his death, Christopher Knight lived in Truman, Minnesota with his fiancée, Kimberly Penkaty, their three-month-old daughter, and Kimberly's three- and four-year-old sons from previous relationships. The house where Knight and Kimberly lived was owned by Kimberly's parents, appellant Paul Penkaty, Sr. (Penkaty) and his wife Beverly. Penkaty and Beverly lived seven miles away in Lewisville.

On March 8, 2003, Penkaty and Ben Davis spent the afternoon together. Before becoming involved with Knight, Kimberly had a six-year relationship with Davis. Davis was the father of one of Kimberly's sons, and her other son also knew Davis as his father. Penkaty and Davis remained friends after Davis's relationship with Kimberly had ended approximately two years earlier. Penkaty was also friends with Knight, but the two men had not spoken for at least a month before Knight's death because of a dispute over $100 that Knight had loaned Penkaty to buy a Christmas present.

On March 8, Penkaty picked Davis up in Fairmont around noon, and the two men drove to Winnebago to check out a car Davis was planning to buy from a friend. After looking at the car, they stopped at a nearby liquor store, where they purchased a 12–pack of beer. Penkaty and Davis began drinking the beer on the way to their next stop, Blue Earth, where Penkaty picked up two Great Dane puppies that a friend had asked him to nurse back to health. The two men drank the rest of the 12–pack in Blue Earth and as they drove back to Lewisville. Davis testified that he drank about half of the beers.

Meanwhile, Tonya Rhoda, a friend of Kimberly and her mother, called and offered to pick up Kimberly and the children and take them to the Penkaty home. Knight objected to the trip. Knight could not accompany Kimberly because he was under pretrial house arrest for burglary charges and could not leave the house except for emergencies. As a condition of his house arrest, Knight wore a GPS[1] ankle bracelet to monitor his location. Kimberly's parents had paid for the GPS monitor so that Knight could be released from jail. As Kimberly was leaving around 4:00 p.m., Knight yelled that if she

1. "GPS" is an abbreviation for global positioning satellite. A person under house arrest wears an ankle bracelet that transmits a radio frequency message to a box in the person's home. If the person leaves home, he must bring the box with him. The box tracks its own position in relation to several satellites, and the person's location is thereby transmitted to a monitoring agency.

left, she could not come back. Kimberly left anyway.

Back at the Penkaty home in Lewisville, Penkaty and Davis were in Penkaty's car, which was parked in the driveway, when Kimberly, Rhoda, and the children arrived. Around 5:00 p.m., Michael Whitehead dropped by for a visit, and a six-year-old Penkaty grandson also came to the Penkaty home sometime in the early evening. From approximately 5:00 until 6:30 p.m., the children played with the Great Dane puppies while the adults socialized, listened to music, and drank beer in the living room. Beverly, who was not drinking, testified that Penkaty drank four or five beers. Rhoda testified that she drank between four and seven beers, and that Penkaty was keeping pace with her. Penkaty testified that he nursed one beer over the course of the evening. Kimberly could not recall whether she or her father had been drinking, but remembered opening some beers upon her arrival. Davis testified that he had three or four beers at the Penkaty home. Penkaty, Davis, and Rhoda also shared at least one bowl of marijuana.[2]

Between 5:00 and 6:30 p.m., Knight telephoned Kimberly between three to eight times, telling her he wanted her to come home. As a result of Knight's repeated calls, Penkaty connected the computer to the internet so that when Knight called, he would receive a busy signal. Shortly after 6:30 p.m., Knight contacted the GPS monitoring agency and falsely reported that there was a medical emergency involving his daughter. At 6:44 p.m., Knight left his home in Truman and drove the seven miles to the Penkaty home in Lewisville, arriving at 6:52 p.m. Some witnesses said Knight knocked on the front door, and others said he pounded on the door. At the time Knight arrived, Penkaty and Whitehead were playing a videogame in the living room.

Beverly answered the door, after which Kimberly stepped outside to speak with Knight. It was a cold evening, but Kimberly neither took a jacket with her nor invited Knight into the house. Back inside the house, Beverly told Davis that he should remain in the bedroom until Knight left because Knight would be upset to see Davis at the house during Kimberly's visit. Beverly then went outside to check on Kimberly.

Knight told Kimberly that he wanted her to leave with him. Accounts of Knight's demeanor during this exchange vary. Kimberly testified that Knight was "[n]ot really yelling, but upset and saying it with authority that he wanted it to be done." Whitehead said Knight was shouting. Rhoda said Knight was "barking orders at Kim." Beverly described Knight's demeanor as both a "funny, strange calm" and "agitated." After talking with Knight, Kimberly agreed to leave with him, but then went into the house. Once inside, Kimberly attempted to lock the door to keep Knight outside, but Knight forced open the door and stepped into the living room, pushing Kimberly with the door in the process.

When Knight entered the room, Penkaty looked up from the videogame and ordered Knight to leave. There was conflicting testimony about how many times Penkaty told Knight to leave, and whether Beverly also told Knight to leave. Davis testified that at this point, "drinking beer" caused him to emerge from hiding and say something to Knight. It is unclear whether

2. Penkaty was 49 years old and had two ruptured disks as well as two prosthetic hips. He testified that smoking marijuana helped relieve his back and hip pain, and also stopped his mind from racing, allowing him to sleep.

Davis told Knight to leave the house, or provoked him, or both. Several witnesses said Knight charged Davis upon seeing him. Davis, who was two inches shorter and 60 pounds lighter than Knight, testified that Knight motioned to him that they should "take it outside." Davis also testified that when Knight turned to leave, Davis tried to tackle Knight, and that Knight apparently heard Davis coming, turned around, and punched Davis in the face, splitting his lip.

Regardless of who started the Knight/Davis altercation, all witnesses agreed that Knight threw the first punch, and the two men wrestled in the living room. Kimberly and Rhoda gathered up the children and took them to a bedroom. Penkaty testified that he dialed 911 and then handed the telephone to Beverly. Beverly's testimony conflicted with Penkaty's on this point. She testified that she called 911 herself, but not until later. Knight and Davis continued to fight, knocking over a lamp and a recliner. Davis testified that Whitehead—who was standing by the front door—restrained Knight, and Davis then took this opportunity to punch Knight. Davis and Whitehead then pushed Knight out onto the front deck.

Witnesses disagreed about the seriousness of the fight, and Beverly, Kimberly, and Rhoda denied seeing any of the fight once it left the interior of the house. Kimberly testified that Knight did kick Davis in the head, that Davis did not stand a chance in the fight, and that Knight was "beating the sh * * out of Ben." Penkaty testified that Knight pounded Davis, stomped him in the head, and dangled Davis by the collar in preparation for hitting him again. But Davis and Whitehead testified that Davis was neither kicked nor stomped, and Whitehead also testified that Davis and Knight were both upright during the struggle outside.

At some point during the fight, Penkaty went to the kitchen, picked up two large knives, and headed for the front door, holding the knives in front of his body with the blades pointed upward. Testimony conflicted as to whether Penkaty paused in the living room, but it is undisputed that Kimberly and Beverly grabbed Penkaty's shirt and tried to stop him from going outside. Penkaty testified that he said to his wife and daughter, "[h]e's killing him * * * why won't you let me help him?" and then Penkaty's shirt ripped and he kept going. No one else testified that Penkaty said anything on his way out the door, but several people heard Kimberly yell, "not in front of the kids!"

Whitehead, still in the front doorway, also tried to stop Penkaty, but was unsuccessful in this effort. Whitehead suffered a cut on his knuckle in the process. Kimberly and Whitehead testified that they tried to stop Penkaty because they feared for Penkaty's safety if he got involved in the fight. Beverly stated that as Penkaty left the house, she called 911 to report the fight while Kimberly sat on the couch and put her head down. Beverly also said that she took the phone into the bathroom so she could hear the 911 operator above the commotion.

The exact details of what happened next are unsettled. Davis originally told investigators that after he pushed Knight out the front door, Knight hit him so hard that he fell down and lost consciousness. When Davis came to, he observed that Knight was stumbling off the deck, having been stabbed. At trial, Davis first testified that as he and Knight were fighting on the front deck, Knight gave him "a very good blow" that caused him to see stars and stumble. Upon righting himself, Davis saw Penkaty pulling a big knife out of Knight's side. Davis later testified that as he and Knight were fighting on the front

deck, Knight hit him, and then Davis saw Penkaty approach Knight, jab him with the knife, and pull it back out.

After being stabbed, Knight apparently stumbled off the deck, walked into the yard, turned around, and collapsed on his way back to the house. Penkaty went back into the house, where Beverly was talking to a 911 operator. On the 911 tape, Penkaty's voice can be heard in the background telling Beverly that Knight was dead. Penkaty testified that he opened the front door, told Beverly he had stabbed Knight, and asked her to call for an ambulance. Penkaty then dropped the knives in the kitchen sink and when he did so, he noticed that one of the knives was broken and the blade was missing.

Penkaty put on a new shirt and spoke briefly with Whitehead, who was leaving the house.[3] Penkaty then went back outside, where Davis was trying to help Knight into the house. Penkaty and Davis dragged Knight into the living room, where Penkaty, Rhoda, and Kimberly performed CPR and applied pressure to the stab wound. At some point after the stabbing but before the police arrived, Penkaty took the telephone from Beverly and said to the 911 operator, "[t]his man is dying. I need an ambulance here now. * * * This man is dying. * * * He is dying here. He is not going to make it." The call was disconnected after the operator asked Penkaty for the second time who had stabbed the victim.

At 7:07 p.m., approximately eight minutes after Beverly placed the 911 telephone call, the police arrived and met Beverly outside the home. An ambulance pulled up at approximately the same time. At 7:08 p.m., four police officers entered the home to secure it for the paramedics. An officer who entered through the front door asked Penkaty, Kimberly, and Rhoda where the suspect was. After the officer repeated the question, Penkaty responded, "I was the one who stabbed him." The officer then escorted Penkaty away from Knight and into the kitchen. On the way to the kitchen, Penkaty said, "I stabbed him, I stabbed him. He, he should have left me alone." When Penkaty and the officer entered the kitchen, a second officer directed the first officer's attention to a knife in the sink. Penkaty then volunteered, "[t]hat's the knife I stabbed him with."

Knight was transported by ambulance to the Madelia Hospital. The police arrested Penkaty and took him to the Watonwan County Law Enforcement Center. On the way, Penkaty asked if Knight was dead, apologized for stabbing him, and said, "Oh, God, I wished he had left me alone." Penkaty did not mention to the police that he had stabbed Knight because he was defending himself or someone else. Meanwhile, medical staff at the hospital attempted for 14 minutes to revive Knight before pronouncing him dead on arrival. An autopsy revealed nine knife wounds on Knight's body—one fatal stab wound, as well as six scratches, and two minor stab wounds, including a defensive wound on his wrist. Knight's death resulted from a knife entering the upper left quadrant of his abdomen and piercing the right ventricle of his heart.

A grand jury subsequently indicted Penkaty for first-degree premeditated murder in violation of Minn.Stat. § 609.185(1) (2004). Penkaty moved to dismiss the indictment, claiming prosecutorial miscon-

---

**3.** Whitehead indicated that he did not want to be at the home when the police arrived because his driver's license would be invalidated if he drank alcohol. It also should be noted that Whitehead suffered a brain injury after these events, but before Penkaty's trial. He experienced some memory problems as a result.

duct in the grand jury proceedings. The district court denied the motion, finding that although the state committed several errors during the grand jury proceedings, sufficient admissible evidence supported the indictment. Penkaty then filed a petition for discretionary review of the order denying his motion to dismiss. The court of appeals denied Penkaty's motion, concluding that (1) presentation of inadmissible evidence does not require dismissal of an indictment if there is sufficient admissible evidence to support the indictment, (2) the state had no clear duty to present possible defenses to the grand jury, and (3) no extraordinary circumstances warranted pretrial discretionary review. Penkaty filed a petition for pretrial review by our court, but then moved to dismiss the petition.

The jury trial began April 5, 2004. At trial, Penkaty admitted to stabbing Knight. His primary defense theory was defense of others—that he acted to prevent Knight from killing Davis. Penkaty testified that he had grabbed the knives merely to scare Knight, but while he was pushing Knight to get him to leave, Knight turned around and charged him. Penkaty testified that after Knight charged him, he looked down and realized that Knight had been stabbed.

As part of his defense, Penkaty testified that he was aware that Knight was under house arrest for burglary, that Knight was facing gun charges, and that Knight had bragged about fighting with Fairmont police officers—an offense for which Knight served time in prison. In an effort to corroborate his knowledge about Knight, Penkaty sought to call two police officers as witnesses to testify regarding Knight's

handgun charge, the fight with Fairmont police officers, and about Knight's reputation within the police community for violence. The district court excluded this testimony.[4]

During the trial, the state called Beverly Penkaty to testify, and Penkaty did not object. At the end of the state's case, Penkaty moved for judgment of acquittal on the count of first-degree premeditated murder, and the district court reserved its ruling on the motion. Later, at the end of the presentation of Penkaty's case, the court denied the motion for judgment of acquittal. Penkaty then requested an instruction on second-degree manslaughter, which the court denied. Penkaty also requested jury instructions on self-defense, defense of others, and defense of dwelling. The state objected to instructions on self-defense and defense of dwelling. The court gave all three defense instructions to the jury.

After deliberating for nine and one-half hours, the jury found Penkaty guilty of first-degree premeditated murder. The district court ordered a presentence investigation. Two days after the guilty verdict was returned, Penkaty moved for a new trial on the grounds that the court erred in (1) excluding testimony regarding Knight's reputation for violence and prior acts of violence, and (2) denying Penkaty's request for a jury instruction on second-degree manslaughter. The court denied Penkaty's motion for a new trial, convicted Penkaty of first-degree premeditated murder, and sentenced him to life in prison.

On this direct appeal, Penkaty raises eight issues: (1) the court erred when it denied his motion to dismiss the grand jury indictment based on alleged prosecu-

---

**4.** The court also excluded evidence that in 1996 Penkaty had been charged with second-degree assault for chasing Davis around the house with a large knife after the two got into an argument while drinking. These charges were ultimately dropped because Penkaty was found incompetent to stand trial.

torial misconduct; (2) the court erred when it prohibited him from calling witnesses to corroborate his testimony regarding prior acts of violence by Knight; (3) the court erred when it allowed Penkaty's wife to testify at trial without his consent; (4) the court erred when it denied Penkaty's requested instruction on second-degree manslaughter; (5) the court erred in the manner in which it instructed the jury on self-defense, defense of others, and defense of dwelling; (6) the court erred when it failed to, sua sponte, give an instruction on first-degree manslaughter; (7) the court erred when it reserved until the end of the presentation of Penkaty's case its ruling on his motion for judgment of acquittal; and (8) the evidence of premeditation was insufficient to support a conviction for first-degree premeditated murder.

## I.

We first address Penkaty's assertion that the district court erred when it denied his motion to dismiss the grand jury indictment due to alleged prosecutorial misconduct during the grand jury proceedings. We have stated that a presumption of regularity attaches to a grand jury indictment, and it is a rare case where an indictment is invalidated. *State v. Greenleaf,* 591 N.W.2d 488, 498 (Minn.1999). But an indictment should be dismissed if the state knowingly engaged in misconduct that substantially influenced the grand jury's decision to indict and if we have grave doubts that the decision to indict was free of any influence of the misconduct. *Id.*

Before we address Penkaty's specific allegations of prosecutorial misconduct, a brief history of the function of a grand jury is instructive. The grand jury has existed for many centuries under English law, where it was originally both an accusing tribunal and a venue for trial. *State v. Iosue,* 220 Minn. 283, 292, 19 N.W.2d 735,

739 (1945). Historically, with limited exceptions, no English subject could be tried for a felony absent prior action by the grand jury. *Id.* In effect, the grand jury "stood as a barrier against royal persecution." *Id.*

Our grand jury system was correspondingly adopted based on "the theory not only of bringing wrongdoers to justice, but also of providing to one accused protection against unfounded and unreal accusations, whether these had their origin in governmental sources or were founded upon private passion or enmity." *Id.* at 292, 19 N.W.2d at 740. The United States Supreme Court has held that "the most valuable function of the grand jury was not only to examine into the commission of crimes, but to stand between the prosecutor and the accused, and to determine whether the charge was founded upon credible testimony or was dictated by malice or personal ill will." *Hale v. Henkel,* 201 U.S. 43, 59, 26 S.Ct. 370, 50 L.Ed. 652 (1906).

We have repeatedly stated that a "prosecutor is a minister of justice whose obligation is to guard the rights of the accused as well as to enforce the rights of the public." *E.g., State v. Cabrera,* 700 N.W.2d 469, 475 (Minn.2005); *State v. Salitros,* 499 N.W.2d 815, 817 (Minn.1993) (quoting I *ABA Standards for Criminal Justice,* The Prosecution Function 3–1.1 and Commentary at 3.7 (2d ed.1979)) (internal quotations omitted). The duty of a prosecutor is to see that justice is done on behalf of both the victim and the defendant. *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). Therefore, a prosecutor does not "represent" the victim. *See id.* A prosecutor represents the public interest and the sovereign and his goal is to see that justice is done. *Id.* This places a special burden on prosecutors because they should prosecute

with "earnestness and vigor," but must "refrain from improper methods calculated to produce a wrongful conviction." *Id.* If a prosecutor abdicates his role as a minister of justice, the grand jury cannot serve its function of standing as a buffer between the state and the accused. We have stated that:

> As a result of the prosecutor's unique relationship with the grand jury, opportunities for influence and manipulation of the process are omnipresent. In *State v. Grose*, the court of appeals noted that "[t]he prosecutor is the person who draws up the indictment, calls and examines the witnesses, advises the grand jury about the law, and is in constant attendance during its proceedings." [*State v. Grose*, 387 N.W.2d 182, 186 (Minn.App.1986).] Prosecutors, therefore, must exercise extreme caution to ensure that the grand jury retains its independent role in our legal system.

*State v. Johnson*, 441 N.W.2d 460, 462 (Minn.1989) (first alteration in original).

■ Penkaty alleges that numerous errors occurred during the grand jury proceedings. He first asserts that the state engaged in misconduct when it examined three witnesses before acting to have grand juror 19, a St. James police officer, excused from the grand jury. Officers from the St. James Police Department—as well as other neighboring agencies—assisted the Watonwan County Sheriff's Department in responding to the 911 telephone call from the Penkaty home. Although grand juror 19 was not on duty at the time Knight was killed, he heard about the events from his fellow officers. Furthermore, when grand juror 19's work shift began at 9:00 p.m. on the date of Knight's death, one of his responsibilities was to attempt to locate the coroner. Grand juror 19 also indicated that he had "seen [Penkaty] in the jail," that he knew all of

the police officers scheduled to testify before the grand jury, and that he also knew Whitehead "through my work." Despite the state's awareness of these facts, it failed to take any action to have grand juror 19 excused and began calling witnesses.

After the first grand jury witness testified, grand juror 19 asked the witness, who was a police officer, to repeat his answer to an earlier question about a statement Penkaty had made after he was arrested and informed of his *Miranda* rights. The second witness was one of grand juror 19's colleagues at the St. James Police Department. This officer testified about transporting Penkaty to the Watonwan County jail after Penkaty's arrest. After a third officer testified, the state requested that the district court excuse grand juror 19 from the grand jury. The court complied with the request, informing grand juror 19 that the rationale provided by the state was that he was "a police officer in * * * St. James and, [knew] all of the parties involved that were investigating the crime, and may tend to believe their side of the story more than anyone else's because [he was] * * * in the brotherhood." The state added that grand juror 19's "small tangential duty" related to the investigation also contributed to its decision.

The state argues that the record supports the district court's finding "that the impartiality of the grand jury was not compromised by the presence of grand juror 19" because grand juror 19 assured the court that he could be fair and impartial, and the other grand jurors had no opportunity to deliberate or discuss the case before grand juror 19 was excused. The record reflects that five other grand jurors also knew one or more of the police officers who testified, one grand juror had been Davis's Sunday School teacher, and

two other grand jurors reported having had limited contact with Penkaty.

No other grand jurors were excused due to concerns about impartiality. While we acknowledge that grand juror 19 was not the only grand juror with previous contacts with witnesses or Penkaty, we conclude that there is a significant difference between a grand juror who knew one or more witnesses due to living in the same small community and grand juror 19. Grand juror 19 was a police officer who knew nearly all of the witnesses, many of whom were fellow police officers, and was already familiar with some witnesses' versions of the facts before commencement of grand jury proceedings. Therefore, we conclude that to preserve the integrity of the grand jury proceedings, the state should have acted to have grand juror 19 excused before it presented any evidence to the grand jury.

■ Penkaty also argues that the state committed misconduct by failing to instruct the grand jury on affirmative defenses, infringing on the independence of the grand jury, and giving an argumentative closing statement. Penkaty cites no legal authority for his proposition that the state has a duty to instruct the grand jury on affirmative defenses, and we decline to adopt this view. *See State v. Wollan*, 303 N.W.2d 253, 255 (Minn.1981) (holding that the state is not required to present to the grand jury evidence of the defendant's mental illness). The absence of justification is not an element of first-degree premeditated murder. *See* Minn.Stat. § 609.185, subd. (a)(1) (2004).

■ Although the state need not instruct the grand jury on affirmative defenses, it does not follow that the state is free to summarily discount the possibility of justification as a defense. Furthermore, the state is to refrain from presenting an argumentative closing statement. *See*

*State v. Taylor*, 650 N.W.2d 190, 199–200 (Minn.2002). In its closing statement to the grand jury, the state argued:

> Was he protecting someone? Not really. * * *
>
> [T]his wasn't a situation where Mr. Penkaty had to defend Mr. Davis by inflicting an immortal [sic] wound.
>
> * * * *
>
> [T]hat wasn't really a, a life-threatening situation. Mr. Davis didn't have any serious injuries. He, he didn't get a tooth knocked out. He didn't—he—nobody was jumping up and down on him. His life wasn't in danger. But Mr. Penkaty comes roaring out of there and goes to work with his knives.
>
> * * * *
>
> Penkaty was defending no one. And the force he used was clearly and dramatically all out of proportion to, to any risk * * *.
>
> Mr. Penkaty was simply tired of dealing with Chris Knight. * * *

The district court found that the state's closing statement "bordered on being argumentative," and this finding is supported by the record. But we have stated that dismissal of an indictment is not required when the state's closing statement to the grand jury was made "in a somewhat argumentative manner," so long as the state "repeatedly reminded the grand jurors of their independence." *Taylor*, 650 N.W.2d at 199–200. Here, despite the state's strong closing statement, both the state and the court instructed the grand jury on at least eight separate occasions regarding the grand jury's proper role and independence. While we do not condone the state's action in making a closing argument that "bordered on being argumentative," we conclude that the court did not err when it denied Penkaty's motion to

dismiss the indictment because of the state's closing statement.

We next consider Penkaty's allegation that the state infringed on the independence of the grand jury. After the closing statement and in response to a grand juror's question about Knight, the state asserted, "the bottom line probably is, from our point of view, legally is that he certainly wasn't attacking Mr. Penkaty. * * * [W]e don't believe there's anything in the evidence that would justify taking his life, that's the bottom line." After considering this statement along with the state's closing argument, the district court found that the state acted improperly when it "essentially told the grand jury that there was no legal justification for the death of Mr. Knight." We agree with the district court's assessment. "Prosecutors * * * must exercise extreme caution to ensure that the grand jury retains its independent role in our legal system." *Johnson*, 441 N.W.2d at 462.

Penkaty also contends that the state committed misconduct when it informed the grand jury that Penkaty declined to testify. A grand juror asked the state what explanation Penkaty gave for arming himself with a knife when Knight was already outside the home. The Watonwan Assistant County Attorney responded, "[Penkaty] declined to speak with us." At this point, the county attorney quickly added, "[h]e has exercised his right not to discuss that." The assistant county attorney then continued, "as you will hear from the instructions, whether or not he testified before you, that's his Constitutional Right, that is not anything you can hold against him in any way." A second grand juror then asked the state if Penkaty had made a decision not to testify, or if defendants generally did not participate in grand jury investigations. The assistant county attorney replied that Penkaty was

aware of the proceedings and declined to appear, but reiterated that this was Penkaty's right and was not a basis for the grand jury's decision to indict.

A defendant's right against self-incrimination extends to grand jury proceedings. *State v. Gardiner*, 88 Minn. 130, 138, 92 N.W. 529, 533 (1902). Based on this right, we note that the assistant county attorney could have chosen his words more carefully when responding to the first grand juror's question. Further, if the state had been more careful in answering this first question, the second question may not have arisen. But given that the second question had to be answered, the issue of Penkaty's decision not to testify before the grand jury was unavoidable. The only option for the state in its response was to be as neutral as possible and emphasize that Penkaty was exercising his constitutional right. Even if the state's initial response to the grand jurors' questions was inartful, we are satisfied that the state ultimately fulfilled this obligation to vindicate Penkaty's constitutional right against self-incrimination.

Penkaty also argues that the state committed misconduct when it elicited testimony that Penkaty exercised his *Miranda* rights when speaking with investigators. Evidence that a defendant exercised his rights to remain silent or to have an attorney present for questioning is generally inadmissible at trial. *State v. McCullum*, 289 N.W.2d 89, 92 (Minn.1979). Two police officers testified about statements Penkaty made after he was advised of his *Miranda* rights and invoked his right to counsel. The investigators' testimony that Penkaty requested counsel was revealed in the context of the investigator relating statements Penkaty made after the *Miranda* warning—not to show that Penkaty exercised his right to end ques-

tioning until his attorney was present. But to the extent that requesting counsel gives rise to an inference of culpability, providing this information was inappropriate. *See State v. Al–Naseer,* 690 N.W.2d 744, 750 (Minn.2005) (stating that juries may view a request for an attorney as a "badge of guilt").

Penkaty also argues that the state committed misconduct when it elicited inadmissible testimony during the grand jury proceedings about Penkaty's character. Penkaty contends that the state elicited information about Penkaty's prior contacts with the police to demonstrate that he had criminal tendencies. Evidence of prior bad acts by a defendant is not admissible to show a general propensity for criminal activity. *State v. Spreigl,* 272 Minn. 488, 493, 139 N.W.2d 167, 170–71 (1965). Here, the state asked two police officers if they were sufficiently familiar with Paul and Beverly Penkaty that they could identify the Penkatys visually or by voice. The officers indicated that they were. Later, a grand juror asked one of the officers how he became familiar with the Penkatys. The officer responded by listing several incidents for which he had been dispatched to the Penkaty home or had otherwise encountered the Penkatys, including domestic disputes, disputes with neighbors, barking dog complaints, traffic stops, and the arrest of Knight at the Penkaty home. The district court concluded that the officer's response would have been admissible at trial to lay foundation for the officer's identification of Penkaty's voice. Even if this conclusion was erroneous, presentation of inadmissible evidence to the grand jury is not grounds for dismissal of the indictment if there is "sufficient admissible evidence to establish probable cause." *Greenleaf,* 591 N.W.2d at 498.

Finally, Penkaty argues that the cumulative effect of the state's misconduct during the grand jury process was unfairly prejudicial and therefore the district court erred in denying his motion to dismiss the indictment. "Cumulative error exists when the 'cumulative effect of the * * * errors and indiscretions, none of which alone might have been enough to tip the scales, operate to the defendant's prejudice by producing a biased jury.'" *Johnson,* 441 N.W.2d at 466 (quoting *United States v. Samango,* 607 F.2d 877, 884 (9th Cir.1979)). Failing to take action to excuse a local police officer with specific knowledge of the investigation until after several witnesses testified, summarily discounting the possibility that Penkaty may have acted in self-defense, and giving a closing statement that bordered on being argumentative do not comport with the state's proper role in grand jury proceedings.

We find many aspects of the state's conduct to be troubling and it is for this reason we discussed them in detail. As we have previously noted, the state has special responsibilities as a minister of justice and has a unique relationship with the grand jury. *Id.* at 462. Nevertheless, we agree with the district court that the state's errors and lapses in judgment are insufficient to overturn Penkaty's indictment for first-degree premeditated murder when sufficient admissible evidence was presented to substantiate probable cause and the grand jury was repeatedly reminded of its independence. We conclude that there was sufficient admissible evidence to substantiate probable cause, and that the grand jury was repeatedly reminded of its independence. Accordingly, we hold that the court did not err when it denied Penkaty's motion to dismiss the indictment.

## II.

We next address Penkaty's assertion that the district court erred in exclud-

ing relevant evidence that was crucial to his opportunity to present a complete defense. Specifically, Penkaty claims that the court erred when it excluded the testimony of two police officers about (1) Knight's reputation within the police community for violence, and (2) Knight's prior acts of violence, which included assaulting a police officer and felony possession of a stolen handgun. Penkaty argues that this evidence was central to his claim that his actions in self-defense, defense of others, or defense of dwelling[5] were reasonable. We review evidentiary rulings under an abuse of discretion standard even when it is claimed that the exclusion of evidence deprived the defendant of his constitutional right to present a complete defense. *State v. Profit,* 591 N.W.2d 451, 463 (Minn. 1999).

A criminal defendant has the right to a meaningful opportunity to present a complete defense. *Id.* at 463; *see* U.S. Const. amend. XIV; Minn. Const. art. I, § 7. This right necessarily includes the ability to present the defendant's version of the facts through witness testimony. *State v. Richardson,* 670 N.W.2d 267, 277 (Minn.2003). To prove self-defense, a defendant must—among other things—present evidence that (1) the defendant was reasonably put in apprehension of serious bodily harm, and (2) the defendant was not the aggressor. *State v. Basting,* 572 N.W.2d 281, 285 (Minn.1997).

Evidence of a victim's reputation for violence is admissible in a self-defense case to show that the defendant was reasonably put in apprehension of serious bodily harm, provided that the defendant knew of the victim's reputation. *State v. Bland,* 337 N.W.2d 378, 382 (Minn.1983). Reputation evidence is also admissible to show that the victim was the aggressor, and for this purpose the defendant need not have known of the reputation. *Id.*

With regard to Knight's reputation for violence, Penkaty proffered the testimony of a police officer, who would have testified that Knight was "flagged" in the police department's computer system as "dangerous" and "volatile towards law enforcement." The officer also would have testified that "Christopher Knight's name brought caution for the other officers," and as a result it was standard practice for multiple officers to respond to calls or traffic stops involving Knight. This evidence supports Penkaty's claim that Knight had a reputation within the law enforcement community for violence. But Penkaty offered no evidence that he was aware of Knight's reputation within the law enforcement community for violence and, for this reason, we conclude that this evidence is not probative of whether Penkaty was reasonably put in apprehension of serious bodily harm, and is inadmissible for that purpose.

But a defendant need not have been aware of a victim's reputation for violence to admit the reputation evidence for the purpose of showing that the victim was the aggressor. Therefore, the police officer's proffered testimony about Knight's reputation within the law enforcement community for violence would be admissible for the purpose of showing that Knight was the aggressor. Whether Penkaty or Knight was the aggressor was the subject of intense argument at trial. There was conflicting testimony about: (1) how much force Knight used to enter the Penkaty home after Kimberly attempted to lock him outside, (2) how many times

---

5. For the sake of simplicity, we will, where appropriate, use the term "self-defense" to include defense of others and defense of dwelling.

Knight was asked to leave the Penkaty home, (3) whether Knight charged at Davis or Davis charged at Knight in the living room, and (4) whether Knight lunged at Penkaty and fell on the knife, or Penkaty lunged at Knight and stabbed him. Because the question of who was the aggressor was intensely disputed, the reputation evidence proffered by Penkaty was highly probative. We conclude that the police officer's testimony as to Knight's reputation in the law enforcement community for violence was admissible for the purpose of showing that Knight was the aggressor.

■■■■ Evidence of prior acts of violence by the victim, in contrast to reputation evidence, is *not* admissible *to show the victim was the aggressor,* but *is* admissible *to show that the defendant was reasonably put in apprehension of serious bodily harm,* provided that the defendant knew of the prior acts. *Bland,* 337 N.W.2d at 382. Penkaty asserts that the district court erred when it excluded testimony by two police officers about alleged prior acts of violence by Knight. A police officer was prepared to testify that, on a traffic stop of a vehicle in which Knight was a passenger, the officer found a loaded .44 magnum revolver along with a "speed loader" with six live rounds, five loose rounds, one empty brass casing, a diver-type dagger knife, and a buck knife under Knight's seat. As a result of this incident, Knight was charged with felony possession of a firearm because he had a previous felony conviction and an active order for protection. It was later learned that the revolver had been stolen in a burglary.

A second police officer was prepared to testify that while he was assisting a state trooper on a traffic stop involving Knight,

Knight pushed the state trooper and started to flee. When the officer attempted to detain Knight, Knight assaulted him. The officer would have testified that Knight grabbed the officer's face and began "jabbing [the officer's] eyes out." The officer also would have testified that he thought Knight reached for the officer's gun during the struggle, and that Knight did not stop resisting until the state trooper sprayed Knight twice with a chemical irritant. Finally, the officer would have testified that Knight was sentenced to prison for this assault.

Penkaty testified that Knight had told him that Knight had "gun charges" pending against him and that this frightened Penkaty. Penkaty also testified that Knight had bragged to Penkaty that he was pulled over in Fairmont, got into a fight with numerous Fairmont police officers, and was trying to take a gun from one of the police officers. Penkaty testified that he was aware that Knight had gone to prison for the assault of a police officer. Because Penkaty was aware of these prior acts of violence,[6] we conclude that the police officers' testimony about Knight's prior acts of violence was admissible to show that Penkaty was reasonably put in apprehension of serious bodily harm.

To summarize, Knight's reputation within the law enforcement community for violence is not admissible to show that Penkaty was reasonably put in apprehension of serious bodily harm because Penkaty was not aware of the reputation, but is admissible to show that Knight was the aggressor. But evidence of Knight's prior acts of violence is not admissible to show that Knight was the aggressor; rather, it is admissible

---

**6.** We do not render a decision on whether felony possession of a firearm is an "act of violence" for purposes of showing that Penkaty was reasonably put in apprehension of serious bodily harm.

to show that Penkaty was reasonably put in apprehension of serious bodily harm because he was aware of the prior acts of violence.

 We turn now to whether other rules of evidence or criminal procedure preclude admission of the evidence of Knight's reputation for violence and prior acts of violence. Even if the evidence is admissible for the purpose of showing reasonable apprehension or to identify the aggressor, the rules of criminal procedure and evidence still apply. *See Profit*, 591 N.W.2d at 463. "Although *relevant*, evidence may be *excluded* if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Minn. R. Evid. 403 (emphasis added). Here, the district court excluded the officers' testimony based on the court's conclusion that the evidence was cumulative and the probative value of the evidence was outweighed by the danger of unfair prejudice.

There is no doubt that evidence of Knight's reputation within the law enforcement community for violence, his assault of a police officer, and his firearm possession charge would be prejudicial to the state's case. But the question is not whether the evidence is prejudicial, but whether it was *so unfairly prejudicial as to substantially outweigh its probative value.* Minn. R. Evid. 403. Penkaty's theory of defense was that Knight was the aggressor and that Penkaty used the force he reasonably believed was necessary to prevent death or great bodily harm. The police officers' testimony was highly probative of these issues and was crucial to Penkaty's meaningful opportunity to present a complete defense. Because of the centrality of this evidence to Penkaty's defense, we conclude

that the probative value of the evidence was not substantially outweighed by the risk of unfair prejudice.

 Finally, we address whether the police officers' testimony was cumulative. Despite exclusion of the police officers' testimony, other evidence was presented to the jury regarding Knight's firearm possession charge and his assault of a police officer. But this evidence was presented through Penkaty's own testimony and that of Penkaty's family, which the jury may have disbelieved as biased. The state's repeated disparagement of Penkaty's claim that deadly force was reasonable under the circumstances further undermined the testimony of Penkaty and his family. In this context, corroboration of this testimony about Knight's prior acts of violence with testimony by police officers who had no personal interest in the case was not cumulative. As for the testimony regarding Knight's reputation within the law enforcement community for violence, it was not cumulative because it was the only evidence offered on this specific issue. Because we conclude that the proposed testimony was neither unfairly prejudicial nor cumulative, we hold that the district court abused its discretion when it excluded this testimony. At this point, we need not determine if this error, standing alone, was harmless beyond a reasonable doubt. As discussed in the following sections, additional errors occurred during Penkaty's trial, which, taken cumulatively, had the effect of depriving him of a fair trial.

### III.

 Penkaty next asserts that the district court erred when it allowed his wife, Beverly, to testify at his trial without first obtaining his consent. Because Penkaty failed to object to Beverly's testimony

at trial, he forfeited this issue for purposes of appeal. *See State v. Djonne*, 293 N.W.2d 45, 46 (Minn.1980). Nevertheless, we have the discretion to address any alleged error if it is a plain error affecting Penkaty's substantial rights. Minn. R.Crim. P. 31.02; *State v. Griller*, 583 N.W.2d 736, 740 (Minn.1998). We have adopted the three-prong plain error test established by the United States Supreme Court requiring that there be (1) error, (2) that is plain, (3) that affects the defendant's substantial rights. *Griller*, 583 N.W.2d at 740. If all three prongs are satisfied, we then determine whether we should address the error to ensure the fairness and integrity of the judicial proceedings. *Id.* at 742. Here, after conducting a careful review of the record and applying the plain error doctrine, we choose to address the alleged error because the importance of the marital privilege, the nature of Beverly's testimony, and the facts leading up to Penkaty's failure to assert this right indicate that Penkaty's substantial rights were affected.

Marital privilege is codified at Minn. Stat. § 595.02, subd. 1(a) (2004), which provides that "[a] husband cannot be examined for or against his wife without her consent, nor a wife for or against her husband without his consent." The state called Beverly as a witness at trial. Penkaty neither explicitly consented nor objected to her testimony. Beverly testified about the events surrounding Knight's death, including her observations that (1) Penkaty drank four or five beers that evening, (2) Penkaty was "mad" when Knight and Davis began fighting, (3) Penkaty stood by the window holding two knives straight out in front of his body with the blades pointing upward, (4) she had tried to restrain Penkaty by holding onto his shirt and "screaming and yelling his name," (5) she and Kimberly together were unable to restrain Penkaty because he "ripped out of [his] shirt," (6) she called 911 as Penkaty left the house and advanced toward Knight, and (7) Penkaty said "I stabbed him" while she was still on the telephone with the 911 operator.

Defense counsel's failure to object to Beverly's testimony was based on counsel's erroneous belief that there was a general exception in the marital privilege statute for homicide cases.[7] This mistaken belief appears in the record when, in response to the state's statement that "[Beverly] does not have to testify," defense counsel declared, "[y]ou know that does not apply in homicides. Look the rule up." This statement was made in the presence of the judge, but the court did not address defense counsel's mistaken belief or seek Penkaty's consent to having his wife appear as a witness.

Defense counsel's assertion that Beverly had no choice but to testify indicates a lack of awareness that Penkaty could have prevented his wife's testimony by objecting. This lack of awareness may have prevented Penkaty from vindicating his rights. Because defense counsel was unaware that the marital privilege applied, we conclude that Penkaty could not have waived the privilege because waiver requires an intentional relinquishment. *See State v. Richards*, 456 N.W.2d 260, 264 (Minn.1990). Furthermore, because the absence of an intelligent relinquishment was apparent at trial, we conclude that the district court erred in allowing the state to call Beverly

---

7. There is an exception to the marital privilege for a "criminal action or proceeding in which one is charged with homicide * * * *and the date of the marriage of the defendant is subsequent to the date of the offense * * *.*" Minn.Stat. § 595.02, subd. 1(a) (emphasis added). Beverly and Paul Penkaty had been married for 29 years at the time of Knight's death.

to testify. This error was plain at the time of trial because Minn.Stat. § 595.02, subd. 1(a), unequivocally requires the nontestifying spouse's consent.

As discussed above, Beverly testified at length about Penkaty's actions on the evening of Knight's death. The jury may have found Beverly's testimony especially compelling because she was the only eyewitness who had consumed no alcohol or drugs on the night of Knight's death. Under these circumstances, we conclude that the district court's failure to obtain Penkaty's consent before allowing Beverly to testify affected Penkaty's substantial rights.

Having concluded that the first three prongs of the plain error test are satisfied, we now consider whether the error affected the fairness and integrity of the judicial proceedings. Beverly's testimony was of critical importance to the state's case not just because of its substance, but also due to her likely credibility with the jury. We therefore conclude that Beverly's testimony had a fundamental effect on the fairness and integrity of the trial, and we hold that the court committed plain error when it allowed Beverly to testify at Penkaty's trial without his consent.

## IV.

■■■ Penkaty also argues that the district court erred when it denied his request for a jury instruction on second-degree culpable negligence manslaughter. We review the denial of a requested lesser-included offense instruction under the abuse of discretion standard. *State v. Dahlin*, 695 N.W.2d 588, 597 (Minn.2005). The trial court must give a requested lesser-included offense instruction if "(1) the lesser offense is included in the charged offense; (2) the evidence provides a rational basis for acquitting the defendant of the offense charged; and (3) the evidence pro-

vides a rational basis for convicting the defendant of the lesser-included offense." *Id.* at 598. In making these determinations, the court must view the evidence in the light most favorable to the requesting party and must not weigh the evidence or make credibility determinations. *Id.* Error in denying a requested lesser-included offense instruction is grounds for reversal unless the defendant was not prejudiced by the omission. *Id.*

■■■ Second-degree culpable negligence manslaughter is a lesser-included offense of first-degree premeditated murder. *State v. Edwards*, 343 N.W.2d 269, 274 (Minn.1984). A person is guilty of second-degree culpable negligence manslaughter if he "causes the death of another * * * by the person's culpable negligence whereby the person creates an unreasonable risk, and consciously takes chances of causing death or great bodily harm to another." Minn.Stat. § 609.205, subd. 1 (2004).

Premeditation was the subject of significant conflicting testimony and argument at Penkaty's trial. Viewing the conflicting evidence in the light most favorable to Penkaty, there would have been a rational basis for the jury to acquit Penkaty of first-degree premeditated murder. It is undisputed that Penkaty did not seek out Knight, or even expect Knight to come to the Penkaty home. It is also uncontroverted that after the stabbing, Penkaty not only remained at the house, but administered CPR in an effort to revive Knight.

Having concluded that the evidence provides a rational basis for acquitting Penkaty of the offense charged—first-degree premeditated murder—we now turn to whether the evidence provides a rational basis for convicting Penkaty of the lesser-included offense of second-degree culpable negligence manslaughter. In his defense,

Penkaty presented evidence that Knight lunged at him as he was holding a knife, that he did not remember stabbing Knight, and that Knight lunging at him and falling on the knife (rather than Penkaty lunging at Knight and stabbing him) was one of the possibilities to explain the nature of the fatal wound. If the jury accepted Penkaty's argument that he armed himself with the knives for the purpose of scaring Knight and the fatal stab wound resulted from Knight lunging at Penkaty while Penkaty was holding the knives, the jury could have concluded that Penkaty was guilty of second-degree culpable negligence manslaughter.

We have held that a defendant is not prejudiced by denial of an instruction on unintentional homicide when "the verdict * * * indicates that the jury believed that the defendant not only had the requisite intent but also acted with premeditation." *State v. Merrill*, 274 N.W.2d 99, 105 (Minn. 1978). Here, the jury considered instructions on first-degree premeditated murder and second-degree intentional murder and found that Penkaty had acted not only with intent but with premeditation. Generally under these circumstances we would conclude that the defendant was not prejudiced by the denial of an instruction on second-degree culpable negligence manslaughter.

But the presumption that the defendant was not prejudiced by denial of a "culpable negligence" instruction when the jury rejected "intentional" in favor of "premeditated" implicitly rests on a determination that the jury was provided with the evidence necessary to make accurate findings. Here, the district court prevented Penkaty from presenting witnesses to support his version of the facts and allowed Beverly to testify without Penkaty's consent. On these specific facts and circumstances, Penkaty may have been prejudiced by the denial of an instruction on second-degree culpable negligence manslaughter. Accordingly, we hold that the district court erred when it denied Penkaty's request for an instruction on second-degree culpable negligence manslaughter.

We have concluded that there were numerous errors and irregularities in this case that cast considerable doubt on whether Penkaty received a fair trial. Penkaty was prevented from presenting witnesses to support his version of the facts and, in particular, relevant evidence that was crucial to his opportunity to present a complete defense; his wife was permitted to testify against him without his consent; and he was denied the ability to submit to the jury an instruction on the lesser-included offense of second-degree culpable negligence manslaughter. These errors, taken cumulatively, deprived Penkaty of his right to a fair trial. While the impact of any one of these errors, standing alone, may not have affected the verdict, we cannot conclude on this record that the cumulative effect of these errors was harmless beyond a reasonable doubt. Therefore, we reverse and remand for a new trial.

## V.

Penkaty also asserts that the district court's jury instructions on self-defense, defense of others, and defense of dwelling contained several errors. Although Penkaty did not object to the instructions at trial, we have the discretion to review any error if it is plain error affecting substantial rights. *Griller*, 583 N.W.2d at 740. While we do not consider Penkaty's argument on the jury instruction to have merit, we will conduct a plain error analysis in light of the fact that Penkaty's primary defense was self-defense and that such an analysis will be instructive to the district court in light of

our determination to reverse and remand for a new trial.

■■■■ Penkaty first argues that the jury instructions on self-defense, defense of others, and defense of dwelling, when read as a whole, were confusing and suggested that Penkaty had a duty to retreat despite being on the front deck of his own home. Generally, there is a duty to retreat if reasonably possible when acting in self-defense. *State v. Glowacki*, 630 N.W.2d 392, 399 (Minn.2001). But there is no duty to retreat when acting in defense of dwelling. *Id.* At the time of the stabbing, Penkaty, Knight, and Davis were on the front deck of the Penkaty home. The district court concluded as a matter of law that the front deck was a part of Penkaty's dwelling. The court's instructions state in two places that Penkaty had no duty to retreat from his own home, and language was added to the defense of dwelling CRIMJIG stating that fear of great bodily harm was not required. District courts have broad discretion in selecting the language of jury instructions, so long as the instructions do not materially misstate the law. *State v. Hare*, 575 N.W.2d 828, 833 (Minn.1998). Here, we conclude that the court's jury instructions did not materially misstate the law because they repeatedly stated that Penkaty had no duty to retreat from his own home.

■■■ On appeal, Penkaty contends that it was unnecessary to provide jury instructions on both defense of others and defense of dwelling. But at trial Penkaty requested instructions on self-defense, defense of others, and defense of dwelling, and the state objected to the district court giving instructions on self-defense and defense of dwelling. We have stated that "[a] party is entitled to a particular jury instruction if evidence exists at trial to support the instruction." *State v. Auchampach*, 540 N.W.2d 808, 816 (Minn. 1995). Penkaty's primary theory of defense appears to be that he was acting in defense of Davis. It is undisputed that an instruction on defense of others was supported by the evidence. But Penkaty also presented evidence that he was defending himself and his home. Penkaty testified that as he attempted to prevent Knight from "killing" Davis, Knight "flung around and knocked [Penkaty] up against the door" and that "[Knight] started coming at [Penkaty]," and "[a]ll [Penkaty] could see were these red eyes and this * * * big, red face." Penkaty also testified that when Knight entered the Penkaty home, "the door blew open knocking Kimberly over into the door," and that Knight refused to leave despite being told to leave several times. In light of Penkaty's testimony and other evidence presented at trial, we conclude that the court did not err when it gave Penkaty's requested instructions on both self-defense and defense of dwelling.

■■■ Finally, Penkaty argues that the district court's instructions on self-defense, defense of others, and defense of dwelling erroneously suggested to the jury that Penkaty bore some burden of proof. A defendant in a homicide case does not bear the burden of proof that he acted in self-defense. *State v. Columbus*, 258 N.W.2d 122, 123 (Minn.1977). The burden of proof is on the state to convince the jury beyond a reasonable doubt that a defendant did not act in self-defense. *Id.* But a defendant claiming self-defense does bear the burden of production. *Id.* "The defendant only has the burden of going forward with evidence to support his claim of self-defense." *Id.* The jury instructions on self-defense identified Penkaty's burden of production: "[t]here must be a sufficient threshold of evidence to support the [required elements of self-defense]." But the next sentence of the jury instruc-

tions explained that the state bore the burden of proof regarding the absence of self-defense: "[t]he State, however, has the burden of proving that the defendant did not act in self defense. To prove that Paul Penkaty did not act in self defense, the State is required to prove the nonexistence of at least one of the [required elements of self-defense] beyond a reasonable doubt." Read as a whole, the jury instructions provided an accurate statement of the law. Therefore, we conclude that the jury instructions on self-defense, defense of others, and defense of dwelling were properly submitted to the jury, were not confusing, made it clear that Penkaty did not have a duty to retreat, and did not improperly shift the burden of proof.

## VI.

Penkaty also makes two other arguments: (1) that the court erred when it failed to sua sponte give a jury instruction on first-degree heat-of-passion manslaughter; and (2) that the district court erred in reserving its ruling on his motion for judgment of acquittal. Failure to request a lesser-included offense instruction warranted by the evidence is an implied waiver of the defendant's right to receive the instruction. *Dahlin*, 695 N.W.2d at 597–98. If an instruction is expressly or knowingly waived, the court has the discretion to withhold the instruction, and a party may not argue that the court erred in not sua sponte giving the instruction. *Id.* at 598 (citing *Bellcourt v. State*, 390

N.W.2d 269, 274 (Minn.1986); *State v. Walker*, 306 Minn. 105, 235 N.W.2d 810, 820 (1975)). Here we conclude that any claim that the court failed to give a first-degree heat-of-passion manslaughter instruction was waived.

Secondly, if a motion for judgment of acquittal is made at the close of the state's case, it is error for the district court to reserve its ruling on the motion. Minn. R.Crim. P. 26.03, subd. 17(2) ("If the defendant's motion is made at the close of the evidence offered by the prosecution, the court may not reserve decision of the motion."). Penkaty made his motion for judgment of acquittal at the close of the evidence offered by the state. Nevertheless, the court waited until after Penkaty completed the presentation of his own case to the jury before it denied the motion. The court's failure to promptly rule on Penkaty's motion violated Rule 26.03, subd. 17(2), but in light of the numerous other errors in this trial, we need not analyze this misstep in depth. We simply note that it was inappropriate for the court to delay its ruling on Penkaty's motion.[8]

Reversed and remanded for a new trial.

---

**8.** Because we have remanded for a new trial, we do not address Penkaty's argument that the evidence of premeditation was insufficient to support a conviction of first-degree premeditated murder.