STATE OF MINNESOTA

IN SUPREME COURT

A14-0570

Original Jurisdiction

Per Curiam
Dissenting, Lillehaug, Page, and Anderson, JJ.

In re Petition for Disciplinary Action
against Duane A. Kennedy, a Minnesota
Attorney, Registration No. 55128

Filed: June 10, 2015
Office of Appellate Courts

_____

Martin A. Cole, Director, Kevin T. Slator, Senior Assistant Director, Office of Lawyers
Professional Responsibility, Saint Paul, Minnesota, for petitioner.

Eric Lawrence Newmark, Jill A. Brisbois, Minneapolis, Minnesota, for respondent.

_____

S Y L L A B U S

The referee's determination that respondent attorney engaged in professional
misconduct by offering to have his client, a complainant in a criminal sexual conduct
case, act more favorably for the defendant as a witness in the defendant's criminal case if
the defendant paid respondent's client to settle his civil claims against her, is not clearly
erroneous. Based on this misconduct and the aggravating factors present, the appropriate
discipline is a suspension for a minimum of 30 days.

1

O P I N I O N

PER CURIAM.

The Director of the Office of Lawyers Professional Responsibility filed a petition for disciplinary action against respondent Duane A. Kennedy, alleging that Kennedy committed professional misconduct by stating in a letter that his client, a complainant in a criminal sexual conduct case, would not testify against the defendant in her criminal case if the defendant settled the complainant's civil claim for $300,000. Following an evidentiary hearing, the referee found that Kennedy violated Minn. R. Prof. Conduct 8.4(a) and 8.4(d) and recommended a suspension for a minimum of 90 days. We conclude that the referee's findings and conclusions are not clearly erroneous but that a suspension for a minimum of 30 days is the appropriate discipline for this misconduct.

Kennedy has been licensed to practice in Minnesota since 1975. He is a solo practitioner who handles both criminal defense and personal injury matters. On June 19, 2013, we publicly reprimanded Kennedy and placed him on 2 years of probation for representing both a defendant and a witness in the same matter and failing to inform another client of a settlement offer unless the client paid outstanding attorney fees that were due Kennedy. *In re Kennedy*, 831 N.W.2d 912, 912 (Minn. 2013) (order).

The Director filed the instant petition for disciplinary action while Kennedy was on disciplinary probation. The misconduct alleged in the petition relates to three letters Kennedy sent on behalf of his client, B.W., approximately 1 month after Kennedy was placed on disciplinary probation. Kennedy filed a timely answer to the petition, and we appointed a referee.

2

Following an evidentiary hearing, the referee issued findings of fact, conclusions, and a recommendation for discipline. The referee made the following findings and conclusions.

In April 2013, S.P. ("the defendant") was charged with third-degree criminal sexual conduct and misconduct of a public employee.[1] The criminal complaint alleged that while the defendant was a juvenile probation officer, she had a sexual relationship with B.W., a person who was on probation in Minnesota. The defendant was not B.W.'s probation officer, but the defendant was aware that B.W. was on probation. The defendant retained C.C. ("defense counsel") as her criminal defense attorney. B.W. retained Kennedy to pursue a civil claim against the defendant.

On July 12, 2013, Kennedy faxed a letter to defense counsel, introducing himself as B.W.'s attorney. Kennedy stated that he only represented B.W. "for this civil [claim]." Kennedy then wrote: "The only good resolution for [the defendant] is a dismissal, where she has a right to expungement. I demand settlement for $300,000.00. If [the defendant] is interested, I suggest we discuss in person, and move promptly." Defense counsel did not respond to this letter.

On July 17, 2013, Kennedy faxed a second letter to defense counsel. Kennedy referenced the first letter's offer and wrote: "It could result in dismissal of the criminal complaint against [the defendant], with a right of expungement. If she is interested,

---

[1]     The criminal sexual conduct charge alleged a violation of Minn. Stat. § 609.344, subd. 1(m) (2014), which prohibits sexual penetration between an employee of a county correctional system and a person who is under supervision of the correctional system. Consent is not a defense to such a charge. *Id.*

please call and we can meet to discuss." Defense counsel did not respond to this letter. He did, however, file a complaint with the Director related to the two letters.

On July 29, 2013, before Kennedy was aware that the Director had received defense counsel's complaint, he faxed a third letter to defense counsel. Kennedy wrote: "If [B.W.] can settle with [the defendant], he may decide to ask the prosecutor to dismiss, and he may decide to not testify against her. In that event, she would not be convicted and could acquire expungement." Again, defense counsel did not respond to this letter.

Kennedy testified that at the time he faxed the letters, he and B.W. had agreed to threaten a civil lawsuit against the defendant alleging claims of assault and battery. Kennedy had told B.W. that he would not actually file such a lawsuit against the defendant. According to Kennedy, the "theme" of the letters was "[s]ettle a civil lawsuit, and I will essentially act more favorably for you as a witness in the criminal case."

Ultimately, the defendant pleaded guilty to misconduct of a public employee, and the State dismissed the criminal sexual conduct charge. The prosecutor who handled the criminal case testified that she received Kennedy's letters from defense counsel pursuant to "Rule 9 as a continuing disclosure . . . indicating he intended to use them at trial." The prosecutor testified that the letters "had a chilling effect" on the criminal case and she felt that she could not move forward with the sexual assault charge because B.W.'s credibility had been "completely gutted."

The referee found that Kennedy's letters "were intended to convey an offer from [Kennedy] that in exchange for a money payment from [the defendant], [B.W.] would decide not to testify against [the defendant] in the criminal case." The referee also found

4

that the letters substantially influenced the prosecutor's decision to offer a plea bargain because they "alerted defense counsel . . . that [B.W.] may be an uncooperative witness and may have been willing to barter his testimony in exchange for a price." The referee however, determined that the letters did not "constitute the primary or compelling reason" for the prosecutor's decision.[2] Nevertheless, the referee found that "prejudice to the criminal prosecution was intended by" Kennedy "and actually resulted from his letters."

The referee concluded that respondent violated Minn. R. Prof. Conduct. 8.4(a) and 8.4(d). The referee found aggravating factors based on Kennedy's commission of the current misconduct while on disciplinary probation; Kennedy's prior discipline; Kennedy's lack of remorse and insistence that he had done nothing wrong; and Kennedy's substantial experience in the practice of law. The referee recommended that Kennedy be suspended for a minimum of 90 days and that he be required to petition for reinstatement.

Kennedy challenges the referee's findings that by sending the three letters to defense counsel, he intended to prejudice the defendant's criminal prosecution, claiming his only intent was to settle a valid claim B.W. had against the defendant. He further challenges the referee's conclusions that by attempting to settle B.W.'s civil claim

---

[2] The referee based this finding on, among other things, the significant evidence the State had against the defendant, even without the testimony of B.W., including the defendant's admissions to police, and that B.W. was always subject to impeachment because of his criminal record.

5

against the defendant, he violated Minn. R. Prof. Conduct 8.4(d) or 8.4(a). Finally, Kennedy argues the referee's recommended discipline is too severe.

## I.

When a party to a disciplinary proceeding orders a transcript, "the referee's findings and conclusions are not conclusive." *In re Paul*, 809 N.W.2d 693, 702 (Minn. 2012). However, we give "great deference to the referee's findings of fact and will not reverse those findings 'if they have evidentiary support in the record and are not clearly erroneous.'" *In re Coleman*, 793 N.W.2d 296, 303 (Minn. 2011) (quoting *In re Varriano*, 755 N.W.2d 282, 288 (Minn. 2008)). We "will review the interpretation of the" Minnesota Rules of Professional Conduct "de novo," but will "review the application of [those rules] to the facts of the case for clear error." *In re Aitken*, 787 N.W.2d 152, 158 (Minn. 2010).

## II.

We first address Kennedy's challenges to the referee's findings and conclusions that by sending the three letters, Kennedy violated Minn. R. Prof. Conduct 8.4(a)[3] and 8.4(d).[4] Kennedy argues that the referee's findings about the terms of the settlement offer

---

[3] Rule 8.4(a) prohibits an attorney from "violat[ing] or attempt[ing] to violate the Rules of Professional Conduct, knowingly assist[ing] or induc[ing] another to do so, or do[ing] so through the acts of another." All of Kennedy's arguments related to Rule 8.4(a) are dependent on his arguments about the referee's findings and conclusions regarding Rule 8.4(d). As a result, we will limit our analysis to the referee's findings and conclusions regarding Rule 8.4(d).

[4] Rule 8.4(d) prohibits an attorney from "engag[ing] in conduct that is prejudicial to the administration of justice."

6

that he made to the defendant are clearly erroneous. The referee found that B.W. "may have been willing to barter his testimony in exchange for a price" and that "in exchange for a money payment from [the defendant], [B.W.] would decide not to testify against [the defendant] in the criminal case."

Kennedy argues that these findings are not supported by the record because he testified that the offer was merely that B.W. would ask the prosecutor to dismiss the charges if a settlement could be reached and that he specifically advised B.W. that while he could try to assert his Fifth Amendment privilege against self-incrimination at the defendant's trial, he would likely be unsuccessful and would be required to testify or face contempt charges. The referee, however, rejected this testimony as not credible. The referee's findings are not clearly erroneous simply because he chose to reject some of Kennedy's testimony. *In re Voss*, 830 N.W.2d 867, 874-75 (Minn. 2013) (stating that the court defers to the referee's findings when they "are based on a credibility determination" and that a referee is free to reject the testimony of an attorney as "not credible"); *accord In re Waite*, 782 N.W.2d 820, 824 (Minn. 2010) ("The referee was free to reject Waite's testimony as lacking credibility and did." (citation omitted)).

Kennedy also argues that the referee clearly erred in finding that he intended to prejudice the administration of justice. Rule 8.4(d), however, does not contain an intent requirement. *See In re Grigsby*, 815 N.W.2d 836, 844 (Minn. 2012); *Waite*, 782 N.W.2d

7

at 824. Whether Kennedy intended to cause prejudice to the administration of justice is not relevant to whether Kennedy violated Rule 8.4(d).[5]

We conclude there is evidence in the record to support the referee's findings that Kennedy offered to have B.W. not testify against the defendant in the criminal case if he received a payment from the defendant. There are, of course, the three letters Kennedy wrote, the contents of which are not disputed. The first letter demands a settlement of B.W.'s civil claim for $300,000 and notes that a "dismissal, where she has a right to expungement" is "[t]he only good resolution for [the defendant]." The second letter makes an express connection between a settlement and the dismissal of the defendant's criminal charges. It states that a settlement "could result in dismissal of the criminal complaint against [the defendant], with a right of expungement."

Having received no response to either of these letters, Kennedy sent a third letter in which he indicates for the first time what B.W. would do if his civil claim settled. The third letter states that if a settlement is reached, B.W. "may decide to ask the prosecutor to dismiss and he may decide to not testify against [the defendant]. In that event, she

---

[5]     Kennedy's intent is relevant to the discipline that should be imposed for violating Rule 8.4(d). *See In re Haugen*, 425 N.W.2d 835, 836 (Minn. 1988) ("[W]hile respondent's reliance upon the accountant to timely file the tax returns may go toward mitigation of discipline, it is not a defense to the claimed violation" of Minn. R. Prof. Conduct 8.4(d)). The referee's finding that Kennedy intended to prejudice the administration of justice is not clearly erroneous. As we have already explained, the referee was free to reject Kennedy's testimony that he was merely trying to settle a valid civil claim on behalf of his client. And there is evidentiary support for the referee's finding that Kennedy intended to prejudice the administration of justice by sending the settlement letters, based on Kennedy's testimony about what he was offering to have B.W. do with respect to the defendant's criminal case as part of the settlement.

would not be convicted . . . ." It was not clearly erroneous for the referee to conclude that in these letters, B.W. is offering to not testify against the defendant in her criminal case in exchange for a cash payment as settlement of B.W.'s civil claim.

Kennedy also testified regarding what he meant when he wrote these letters. In his testimony, Kennedy described the offer as "settle [B.W.'s] civil lawsuit," and B.W. "will essentially *act more favorably for you as a witness* in the criminal case." (Emphasis added). Thus, Kennedy implied that if the defendant paid B.W. $300,000, B.W.'s testimony in the criminal case would change and become more favorable to the defendant.[6] By testifying favorably for the defendant, B.W. would not be offering testimony against her at the defendant's criminal trial.

The justice "system depends on the truthfulness of the testimony of witnesses and false testimony strikes at the very heart of the administration of justice." *In re Salmen*, 484 N.W.2d 253, 254 (Minn. 1992). We have also held that "[m]aking threats of criminal prosecution in order to coerce payment in a civil matter" constitutes misconduct under Rule 8.4(d). *In re Ulanowski*, 800 N.W.2d 785, 796 (Minn. 2011). Implicit in

---

[6]     Acknowledging that we have accurately quoted from Kennedy's testimony, the dissent attempts to diminish this testimony. The dissent claims that we misread the record by pointing to additional statements by Kennedy, and it suggests that a "fair[] read[ing]" of Kennedy's testimony is that he was simply offering to have B.W. give a " 'more favorable' victim recommendation to the prosecutor" if the defendant paid B.W. to settle his civil claim against her. The dissent ignores our standard of review in disciplinary cases. We apply a clearly erroneous standard of review to the referee's findings and defer to a referee's rejection of parts of a lawyer's testimony as not credible. *Voss*, 830 N.W.2d at 874-75. It is clear the referee rejected as not credible Kennedy's assertion that he was only offering that B.W. would ask the prosecutor to dismiss the charges if a settlement could be reached.

such a threat is the promise to refrain from taking action that could lead to future criminal charges if a financial payment is received. If it violates Rule 8.4(d) to offer to change one's conduct with respect to a criminal prosecution that does not yet exist in order to leverage a settlement of a civil claim, it logically follows that offering to change one's testimony in an ongoing criminal case in order to leverage a settlement of a civil action that does not yet exist is also prejudicial to the administration of justice.

While victims of crime certainly have the right to pursue and settle civil claims against the alleged perpetrators of such crime, the integrity of the criminal justice system is called into doubt when attorneys suggest that the testimony a victim will give in a criminal case is malleable and will change to the benefit of the defendant if a cash payment is received from that defendant.[7] *See United States v. Tedesco*, 635 F.2d 902, 907 (1st Cir. 1980) ("An effort to alter the testimony of a witness for corrupt purposes is plainly an endeavor to impede the due administration of justice."); *Fla. Bar v. Machin*, 635 So. 2d 938, 939-40 (Fla. 1994) (holding that an attorney engaged in conduct prejudicial to the administration of justice when he offered on behalf of his client, a defendant in a murder case, to set up a trust fund for the child of the murder victim if the other victim and the family of the murder victim did not testify at a sentencing hearing);

_____

[7] Citing a 1991 American Bar Association ethics opinion, the dissent states that "it has never been the law that an attorney commits misconduct when the attorney assists a client in offering 'to refrain from pressing criminal charges in return for favors in a civil matter.'" (Quoting ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 92-363 (1991)). This case, however, does not involve a lawyer who stated his client would not press criminal charges if a civil settlement could be reached. Kennedy committed misconduct because he offered to have his client, B.W., become a more favorable witness in the defendant's criminal case if the defendant paid B.W. to settle his civil claim.

10

*Iowa Sup. Court Atty. Disciplinary Bd. v. Buchanan*, 757 N.W.2d 251, 254 (Iowa 2008) (holding that a lawyer engaged in conduct prejudicial to the administration of justice when he offered to settle a civil suit in exchange for his client not cooperating in a criminal investigation related to conduct uncovered during that civil suit). We agree with the Florida Supreme Court that "the fair and proper administration of justice requires that the rich and the poor receive equal treatment before the court. . . . [W]hen 'justice' can be bought by the highest bidder, there is no justice." *Machin*, 635 So. 2d at 940.

In summary, we hold that the referee's findings and conclusions that Kennedy violated Minn. R. Prof. Conduct 8.4(a) and 8.4(d) are not clearly erroneous.

III.

The referee recommended that Kennedy be suspended from the practice of law for 90 days and that he petition for reinstatement. Kennedy argues that the recommended discipline is too severe. The Director asks us to adopt the referee's recommendation.

The purpose of disciplinary sanctions for professional misconduct is not to punish the attorney, but rather to protect the public, safeguard the judicial system, and deter future misconduct by the disciplined attorney and other attorneys. *In re Rebeau*, 787 N.W.2d 168, 173 (Minn. 2010). Our court is "the 'sole arbiter' of the discipline to be imposed for professional misconduct by Minnesota lawyers." *In re Albrecht*, 845 N.W.2d 184, 191 (Minn. 2014) (quoting *In re Singer*, 541 N.W.2d 313, 315 (Minn. 1996)). In imposing the appropriate discipline, we consider: (1) the nature of the misconduct; (2) the cumulative weight of the disciplinary violations; (3) the harm to the public and (4) the harm to the legal profession. *Id.* We administer sanctions on a case-

11

by-case basis after considering any aggravating and mitigating circumstances, but we also look to similar cases to ensure consistent discipline. *Id.*

We look first at the four factors relevant to determining the appropriate discipline. Kennedy's misconduct was serious; he offered to have his client change his testimony in the defendant's criminal case so that it would be more favorable to the defendant if the defendant paid him to settle his civil claim against the defendant. We have noted that advising a client to provide false testimony is serious misconduct, even when the client does not actually give false testimony. *In re Knutson*, 711 N.W.2d 807, 809-10 (Minn. 2006) (concluding that an attorney committed "a serious offense" when he advised a client to make false statements to a bankruptcy court in a case in which the attorney never filed a bankruptcy petition on behalf of that client). Thus, simply offering to have a client change his testimony in a criminal case to be more favorable to the defendant as part of a civil settlement, even if the settlement is not accepted or the client does not testify, is a substantial deviation from the conduct we expect of lawyers.

With respect to the cumulative weight of Kennedy's misconduct, we have differentiated between "a single, isolated incident or a brief lapse in judgment," *In re Rooney*, 709 N.W.2d 263, 269 (Minn. 2006), and misconduct that "persisted for an extended period of time and spanned multiple matters." *In re Fru*, 829 N.W.2d 379, 390 (Minn. 2013). Kennedy's misconduct consisted of three letters sent over the course of a few weeks and involved a single matter. Such misconduct is properly characterized as an isolated incident.

12

Kennedy's misconduct harmed the public and the legal profession. Actual harm resulted because the outcome in a criminal case was impacted by Kennedy's conduct. The improper term in Kennedy's settlement offer contributed to the prosecutor's decision to enter into a plea agreement with the defendant on the lesser charge and dismiss the more serious criminal sexual conduct charge. At the same time, we acknowledge this harm was tempered because the referee concluded that Kennedy's letters did not "gut" the criminal case and that the letters did not constitute the "primary or compelling reason" that led to the prosecutor's decision to agree to a plea agreement to the lesser charge. And for the reasons we explained earlier, Kennedy's conduct was harmful to the legal profession because it called into question the integrity of the criminal justice system by suggesting a victim's testimony in a criminal case would become more favorable if a cash payment was received from the defendant. *See In re Aitken*, 787 N.W.2d 152, 162 (Minn. 2010) (explaining that an attorney's "conduct has caused prejudice to the administration of justice and has thus harmed both the public and the legal profession").

We next consider the existence of mitigating and aggravating factors. The referee did not find any mitigating factors, and Kennedy does not challenge that aspect of the referee's report on appeal.

The referee found several aggravating factors, none of which have been challenged by Kennedy. Kennedy committed the misconduct while he was on disciplinary probation, and his prior discipline included engaging in conduct prejudicial to the administration of justice. *In re Selmer*, 749 N.W.2d 30, 40 (Minn. 2008) ("Disciplinary history and violating the disciplinary rules while on probation are both

13

aggravating factors in attorney discipline cases."). Kennedy has not acknowledged any wrongdoing or shown any remorse. *In re Rebeau*, 787 N.W.2d 168, 176 (Minn. 2010) ("The lack of remorse also constitutes an aggravating circumstance."). And Kennedy has substantial experience in the practice of criminal law. *Id.* ("[S]ubstantial experience as a lawyer may constitute an aggravating factor.").

Finally, we consider similar cases. Both parties argue, and we agree, that *In re Backstrom*, 767 N.W.2d 453, 453 (Minn. 2009) (order), involves similar misconduct. In that case, the respondent James Backstrom, the Dakota County Attorney, sent an e-mail "threatening to withdraw support for" the Dakota County Medical Examiner, an appointed official, "unless [she] barred her subordinates from testifying as defense experts in criminal cases." *Id.* At the time Backstrom made this statement, he was aware that a mother who was being prosecuted in another county for killing her newborn baby had retained a forensic pathologist who was also an assistant Dakota County medical examiner as an expert. As a result of Backstrom's e-mail, the assistant medical examiner stopped working for the mother in the murder case.[8] We publicly reprimanded Backstrom. *Id.*

*Backstrom* is similar to this case because the lawyers in both cases attempted to impact a witness's testimony in a criminal proceeding. Backstrom threatened to withhold his support for the medical examiner in an attempt to stop her subordinate from testifying

---

[8] Some of these facts are taken from the petition for discipline filed in *In re Backstrom*. In that case, Backstrom entered into a stipulation for discipline and admitted the allegations in the disciplinary petition. *Backstrom*, 767 N.W.2d at 453.

14

for the defense in a criminal case. Similarly, Kennedy told the defendant that B.W. would become a more favorable witness in her criminal case if the defendant paid B.W. $300,000 to settle his civil claims. In both cases, the lawyer's conduct impacted the criminal case. The prosecutor based her decision to enter into a plea agreement to the lesser charge, in part, on Kennedy's settlement letters, while in *Backstrom*, an assistant medical examiner stopped working as a defense expert in a criminal case because of Backstrom's statements.

There are, however, differences between the cases. There were no aggravating factors in *Backstrom*, but there are four aggravating factors in this case.

We agree with the referee's determination that suspension is the appropriate discipline for Kennedy. We disagree, however, with the referee's recommendation that 90 days is the appropriate length for the suspension. In our judgment, a 30-day suspension is appropriate.

We also disagree with the referee's recommendation that Kennedy be required to petition for reinstatement. When an attorney is suspended for 90 days or less, reinstatement by petition ordinarily is not required, and the attorney may apply for reinstatement by affidavit. *See* Rule 18(f), Rules on Lawyers Professional Responsibility (RLPR). The referee, who recommended a 90-day suspension, did not explain why Kennedy should be required to petition for reinstatement. While this recommendation is not without merit, given that Kennedy committed the instant misconduct while on disciplinary probation and has shown a complete lack of insight into his misconduct, we conclude that a reinstatement hearing should not be required because the misconduct

15

involved an isolated incident, and the Director provided no rationale why the court should require a reinstatement hearing.

Accordingly, we order that:

1. Respondent Duane A. Kennedy is suspended from the practice of law, for a minimum of 30 days, effective 14 days after the date of the filing of this opinion.

2. Respondent shall pay to the Director the sum of $900 in costs pursuant to Rule 24, RLPR, and shall comply with Rule 26, RLPR (requiring notice of suspension to clients, opposing counsel, and tribunals).

3. Respondent shall be eligible for reinstatement to the practice of law following the expiration of the suspension period provided that, not less than 15 days before the end of the suspension period, respondent files with the Clerk of Appellate Courts and serves upon the Director an affidavit establishing that he is current in continuing legal education requirements, has complied with Rules 24 and 26, RLPR, and has complied with any other conditions for reinstatement imposed by the court.

4. Within 1 year of the date of the filing of this order, respondent shall file with the Clerk of Appellate Courts and serve upon the Director proof of successful completion of the professional responsibility portion of the state bar examination. Failure to timely file the required documentation shall result in automatic re-suspension, as provided in Rule 18(e)(3), RLPR.

5. Upon reinstatement to the practice of law, respondent shall be on disciplinary probation for 2 years subject to the following terms and conditions:

16

a.     Respondent shall cooperate fully with the Director's Office in its efforts to monitor compliance with this probation.  Respondent shall promptly respond to the Director's correspondence by its due date.  Respondent shall provide the Director with a current mailing address and shall immediately notify the Director of any change of address.  Respondent shall cooperate with the Director's investigation of any allegations of unprofessional conduct that may come to the Director's attention.  Upon the Director's request, respondent shall provide authorization for release of information and documentation to verify respondent's compliance with the terms of this probation;

b.     Respondent shall abide by the Minnesota Rules of Professional Conduct;

c.     Respondent shall be supervised by a licensed Minnesota attorney, appointed by the Director to monitor compliance with the terms of this probation.  Within 2 weeks from the date of filing of this order, respondent shall provide the Director with the names of 4 attorneys who have agreed to be nominated as respondent's supervisor.   If, after diligent effort, respondent is unable to locate a supervisor acceptable to the Director, the Director shall seek to appoint a supervisor.  Until a supervisor has signed a consent to supervise, respondent shall, on the first day of each month, provide the Director with an inventory of client files as described in paragraph d below.  Respondent shall make active client files available to the Director upon request; and

d.     Respondent shall cooperate fully with the supervisor's efforts to monitor compliance with this probation.  Respondent shall contact the supervisor and schedule a minimum of one in-person meeting per calendar quarter.  Respondent shall submit to the supervisor an inventory of all active client files by the first day of each month during the probation.  With respect to each active file, the inventory shall disclose the client name, type of representation, date opened, most recent activity, next anticipated action, and anticipated closing date.  Respondent's supervisor shall file written reports with the Director at least quarterly, or at such more frequent intervals as the Director may reasonably request.

DISSENT

LILLEHAUG, Justice (dissenting).

Today the court disciplines an attorney for assisting his client, the alleged victim of a crime by a public employee, to negotiate a civil settlement during the pendency of a criminal case. I respectfully disagree with the majority's conclusion that, by assisting his client, respondent Duane Kennedy engaged in conduct prejudicial to the administration of justice under Minn. R. Prof. Conduct 8.4(a) and 8.4(d). The referee's theory of unethical behavior, advanced by the Director, is without sufficient factual support. Perhaps realizing this, the majority constructs and applies its own theory, but that theory is similarly without sufficient support.

I.

A lawyer can be disciplined only when a violation of the Rules of Professional Conduct has been shown by clear and convincing evidence. *In re Nelson*, 733 N.W.2d 458, 461 (Minn. 2007). "In order to prove a claim by clear and convincing evidence, a party's evidence should be unequivocal, intrinsically probable and credible, and free from frailties." *Gassler v. State*, 787 N.W.2d 575, 583 (Minn. 2010). In this case, a referee made findings and conclusions, and we will uphold those findings and conclusions unless they are clearly erroneous. *See In re Gherity*, 673 N.W.2d 474, 480 (Minn. 2004). Even giving the referee great deference, his findings are clearly erroneous.[1]

---

[1] The alleged misconduct consisted of three letters that offered to settle a civil claim. Findings on documentary evidence are arguably not entitled to deference. *See Halla Nursery, Inc. v. City of Chanhassen*, 781 N.W.2d 880, 884 (Minn. 2010) ("The

(Footnote continued on next page.)

D-1

This proceeding arises out of Kennedy's representation of B.W., the alleged victim of criminal sexual conduct and misconduct by a public employee. B.W. had a colorable civil claim against the public employee.

On his client's behalf, Kennedy sent three letters to the attorney who was defending the public employee in the pending criminal case. The attorney shared the three letters with the prosecutor. As the majority recognizes, Kennedy's alleged "misconduct consisted of three letters." Thus, this proceeding turns on precisely what the three letters said—and on what they did not say.

The majority upholds the referee's conclusion that, in those letters, Kennedy, on behalf of his client, offered that the client would not testify in the criminal proceeding in exchange for money. The referee reasoned that this would be accomplished by "defying expected court orders." The problem for the referee and the majority is that nothing in the letters says that.

Neither the first letter nor the second letter says anything about Kennedy's client not testifying. They do speak of the possibility of dismissal of the criminal case should a

_____

(Footnote continued from previous page.)
interpretation of a contract is a question of law, and therefore we review de novo the district court's interpretation . . . ."). But I arrive at the same conclusion, whether the referee is given greater or lesser deference.

civil settlement be reached. But they do not promise a dismissal. Rather, the letters suggest that a dismissal "could" happen, without proposing a method.[2]

Unlike the first and second letters, the third letter does suggest a method by which the criminal charges could be dismissed: that if a civil settlement is reached, Kennedy's client "may decide to ask the prosecutor to dismiss and he may decide to not testify against [the public employee]." Consider carefully the two segments of this sentence.

The first segment is that B.W. "may decide" to ask the prosecutor to dismiss the criminal charges. The referee and the majority do not explain how, if at all, it was unethical for Kennedy to say this on behalf of his client. To be clear, neither Kennedy nor his client promised—nor could they—that the criminal case would be dismissed. A victim does not have the right to decide whether or not a criminal case should be pursued. A prosecutor represents the government, not the victim. *See State v. Penkaty*, 708 N.W.2d 185, 196 (Minn. 2006) ("[A] prosecutor does not 'represent' the victim. A prosecutor represents the public interest and the sovereign and his goal is to see that justice is done." (citation omitted)).

Instead, Kennedy, for his client, suggested that the client "may decide to ask the prosecutor to dismiss." It is not unethical for an attorney, on behalf of his victim client, to offer to ask a prosecutor to dismiss a case, whether or not as part of a civil settlement. The majority cites no authority to suggest that it is. Indeed, our law makes clear that a

---

[2] The majority repeatedly notes that Kennedy's client demanded $300,000. This is a large number. But no attorney would be shocked that a claimant might make a sizable opening demand but settle for much less.

crime victim always has the right to ask a prosecutor to pursue a criminal case or dismiss it. *See, e.g.*, Minn. Stat. § 611A.03, subd. 1(2) (2014) (the victim has "the right . . . to express orally or in writing, at the victim's option, any objection to the [plea] agreement or to the proposed disposition"); Minn. Stat. § 611A.0301 (2014) (the victim has the right to express an objection at a plea presentation hearing); Minn. Stat. § 611A.031 (2014) (the victim of certain crimes has the right to input prior to pretrial diversion); Minn. Stat. § 611A.037, subd. 1 (2014) (the victim has the right, through the presentence investigation report, to opine on the disposition). And it has never been the law that an attorney commits misconduct when the attorney assists a client in offering "to refrain from pressing criminal charges in return for favors in a civil matter." *See* ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 92-363 (1991) (neither the Model Rules nor their predecessor prohibited such offers).[3]

The second segment of the sentence in the third letter suggests that, if the parties arrive at a civil settlement, Kennedy's client "may decide to not testify against" the public employee. Again, the use of the term "may" shows that this is not a promise. If a civil settlement could be reached, Kennedy's client "may"—or may not—choose not to testify. Neither the referee nor the majority cites any authority for the proposition that the exercise of such a choice (absent a subpoena or court order, of course) is unethical or

---

[3]    *See also* 2008 N.C. Formal Ethics Op. 15 (2009) ("Provided the settlement agreement does not constitute the criminal offense of compounding a crime, is not otherwise illegal, and does not contemplate the fabrication, concealment, or destruction of evidence (including witness testimony), a lawyer may participate in a settlement agreement of a civil claim that includes a provision that the plaintiff will not report the defendant's conduct to law enforcement authorities.").

unlawful.  In the absence of lawful compulsion, every citizen in our country has the right to decide whether or not to testify.  *Cf. Roseberry v. Hart-Parr Co.*, 145 Minn. 142, 146, 176 N.W. 175, 176 (1920) (holding that when a party did not subpoena a witness, and instead "saw fit to rely upon his promise to attend," it "ran the risk of losing the benefit of his testimony if he failed to keep his promise").

Going well beyond the plain language of the third letter, and without any testimonial support whatsoever, the referee concluded that Kennedy offered to advise his client to "defy[] expected court orders."  But the third letter does not reference any court orders, actual or potential.  Indeed, when the third letter was sent, there was no outstanding subpoena or court order.  So Kennedy's client was under no legal obligation to attend any hearing or to testify.  The straightforward reading of the second segment is that, to the extent that Kennedy's client will have the choice (can "decide"), he "may" choose not to testify.

In any event, there is absolutely no evidence in the record—much less clear and convincing evidence—that Kennedy ever advised his client to defy a future subpoena or a court order.  To the contrary, the only evidence is Kennedy's own testimony that he never so advised his client, but counseled that, if the client invoked the Fifth Amendment and was granted immunity, the client would have to testify.

Thus, the referee's conclusion that Kennedy offered that his client would defy a subpoena or court order, or advised his client to do so, is unsupported and thus clearly erroneous.

II.

Instead of imposing discipline on the theory of misconduct argued by the Director and adopted by the referee, the majority essentially imposes discipline on a different ground. The majority accomplishes this by picking out from the disciplinary hearing transcript a single question and answer. On direct examination, Kennedy agreed that, on behalf of his client, he offered to "settle [the client's] civil lawsuit," and in exchange his client would "essentially act more favorably for [the public employee] as a witness in the criminal case."

From this single sentence, the majority somehow divines that Kennedy, on behalf of his client, offered, in the words of the majority, that the client's "testimony in the criminal case would *change and become more favorable* to the defendant." (Emphasis added). In other words, the majority reads Kennedy's answer as an admission that Kennedy offered to have his client testify less than truthfully.

Even if the Director had charged Kennedy with conduct prejudicial to the administration of justice by offering to have his client's testimony "change" or counseling his client to "change" testimony,[4] the majority would still have to leap a wide logical canyon. There is not a word in the third letter about Kennedy's client changing his testimony, much less perjuring himself. Nor does Kennedy's testimony support the theory that Kennedy was offering to have his client change his testimony or perjure

---

[4] Because the evidence does not clearly and convincingly prove the ground on which the majority imposes discipline, I need not consider the issue whether the majority opinion violates Kennedy's due process right to be given notice of the charges against him. *See In re Taplin*, 837 N.W.2d 306, 311 (Minn. 2013); *Gherity*, 673 N.W.2d at 478.

himself. In so asserting, the majority quotes Kennedy's answer entirely out of context. Kennedy was actually denying the Director's theory:

> Q. In your experience have you had civil cases that settled prior to the commencement of a lawsuit either the serving of a complaint or the filing of a complaint?
> A. Many.
> Q. Is that to the benefit do you believe of your client as well as to the other side?
> A. Yes.
> Q. So it is fair to say the theme of these three letters wasn't, "Pay me off for not testifying." It was, "Settle a civil lawsuit, and I will essentially act more favorably for you as a witness in the criminal case"?
> A. That is [it] exactly.
> Q. Is that uncommon in your experience as a defense lawyer for the victims to however they are made to feel better about the defendant's conduct either the settling of a criminal lawsuit, showing remorse, writing a letter of apology for a victim to look more favorably upon the defendant and to put in a more favorable recommendation to the prosecutor?
> A. I have seen it for almost forty years.

Fairly read, Kennedy's testimony was that the letters did not demand a pay-off for his client not testifying, but instead sought a civil settlement that would lead to a "more favorable" victim recommendation to the prosecutor. There is absolutely no indication that Kennedy was offering or counseling perjury. The letters did not prejudice the administration of justice.

### III.

While the tone of Kennedy's letters is problematic at best and could be read as tip-toeing toward the ethical line, Kennedy did not clearly and convincingly cross the line. My hope is that the court's holding in this unusual case has not inadvertently fuzzed what most attorneys understand to be a clear line on the extent to which they ethically may

assist civil litigants (including crime victims) in making lawful choices and negotiating settlements during pending criminal proceedings.

For all of these reasons, this is not a case for discipline. I would therefore conclude that the referee's findings and conclusions are clearly erroneous.


PAGE, Justice (dissenting).

I join in the dissent of Justice Lillehaug.


ANDERSON, Justice (dissenting).

I join in the dissent of Justice Lillehaug.